## J. C. BREEDEN, Appellant, v. FRANKFORD MARINE, ACCIDENT & PLATE GLASS INSURANCE COMPANY.

### In Banc, May 22, 1909.

1. **INDEMNITY: Insurance: Negligence: Public Policy: Maintenance.** Contracts entered into by the master and third parties for the relief or reimbursement of the master for damages imposed by law upon him as compensation for injuries sustained by his servant through the negligence of the master, are not null and void, as against public policy, even though they may tend to encourage negligence on the master's part. So that a contract entered into by a mining company and an employer's liability insurance company by which, for a valuable consideration, the insurance company agreed to indemnify the mining company "from legal liability for damages on account of bodily injury or death suffered by any employee of the mining company resulting from any accident of whatever nature or cause happening in or upon the premises of the mining company," is not void as being against public policy. And not being void, but valid, the insurance company was authorized, according to its terms, to intercede and maintain the defense in behalf of the mining company when it was sued by a miner for personal injuries due to his master's negligence.

   *Held,* by WOODSON, J., who wrote the majority opinion, and by VALLIANT, C. J., in a separate opinion, both dissenting on this point, that it is the duty of the master to furnish his servant a reasonably safe place in which to work and reasonably safe machinery with which to work, and that duty is a continuing one and requires the master to maintain the place and machinery in a reasonably safe condition, and those duties are imposed on the master by the State and the laws of industrial society, and to authorize the master to indemnify himself against his own negligence and consequent loss and liability flowing from that negligence would be to encourage him to be negligent, and to permit him to do indirectly what the law will not permit him to do directly, namely, to relieve himself against the penalty which the law imposes to compel·him to be careful for the employee's safety, by casting that burden on a third party, and hence all such indemnifying contracts are contrary to public policy and void. A moneyed compensation to the injured party is not the whole desideratum of the law against negligence; the State is interested in preserving the life, limb and health of employees, and seeks to compel the master, by permitting the employee to

recover a moneyed compensation for personal injuries resulting from the master's negligence, to be vigilantly careful to protect the life, limb and health of the employee; and to permit the master to contract with a third party to pay the monetary damages is to encourage him to be negligent of his employee's personal safety and thereby to authorize him to contract away a public duty.

2. ———: ———: ———: Distinguished From Other Insurance: Third Parties: Lives of Employees. A distinction between fire, life and marine insurance, as being valid and as not affecting the rights of third parties, and indemnity insurance against losses arising from the insured's negligence to third parties, is without substance. If one is valid, so is the other. To overthrow indemnity insurance against losses arising from the employer's negligence to an employee or the carrier's negligence to a passenger would be to overthrow the foundations upon which all insurance is built, whether indemnity, life, accident or fire. Negligence is bound up with or collaterally related to every form of insurance, and the interests of "third persons" are involved in it all. Partial indemnity will produce neglect in one form as much as in another; and the encouragement to negligence on the part of the insured, because of that indemnity, does not invalidate any form of insurance. Courts ought not to base the law upon the theory that employers are controlled only by ignoble self-interest. A predisposition to fraud, neglect, or any form of wrong-doing, is never presumed by the law. [WOODSON, J., and VALLIANT, C. J., dissent in a full discussion by WOODSON, J.]

3. MAINTENANCE: Part of the Law of This State: Interested Party. The law of maintenance, which means the officious intermeddling in the suit of another, is a part of the law of this State; but it does not apply to any person who has, or who honestly believes he has, a valuable interest in the results of the suit. Any interest asserted in good faith, whether contingent, vested, near or remote, in pending litigation, relieves a party from the charge of maintenance.

4. ———: Negligence: Indemnifying Insurance Company. An employer's liability insurance company, which has agreed in its policy to indemnify a mining company "from legal liability for damages on account of bodily injuries suffered by an employee of the mining company resulting from whatever cause" and in the name of the mining company "to defend any legal proceedings instituted by any employee to enforce a claim against the mining company, and to have entire control of such defense," may intercede in a suit brought by an employee against the mining company for damages resulting from the company's negligence, if such indemnifying contract is itself legal; and being legal, as it is held to be herein, the insurance

company was not an officious intermeddler, and therefore did not offend against the law of maintenance, by employing attorneys and conducting the defense, and appealing the case after an adverse verdict; and, therefore, the miner cannot recover in a suit against the insurance company damages sustained by him due to its maintenance of such defense, due to the fact that at the time the judgment was obtained the mining company was solvent, but subsequently became insolvent before said judgment was affirmed on appeal.   [WOODSON, J., and VALLIANT, C. J., dissenting, in a full discussion by WOODSON, J.]

5. ———: Satisfaction: Judgment: Bar.  Where an injured party accepts satisfaction for his injuries from one of two tortfeasors and releases that one from further liability, he thereby releases the other also.  So that where the injured miner, in a damage suit for negligence, obtained a judgment for $3,500 against a mining company, which at the time was insolvent, though when the suit was first instituted and judgment was first obtained and appeal was taken it was solvent, and on the day of the last judgment accepted from the mining company $1,000 in satisfaction thereof and released the mining company from all further liability thereunder, with the knowledge that the money was being furnished by an insurance company which had contracted to indemnify the mining company against all such claims, the miner cannot subsequently maintain a suit for damages against the indemnifying company for wrongful maintenance by defending on behalf of the mining company the miner's suit for his negligent injury.

Held, by VALLIANT, C. J., dissenting, that when both the liability and the amount are settled beyond controversy by a final judgment, there is no room for compromise, or for accord and satisfaction; but in such case the payment of a less sum than the judgment is a part payment only, even though a receipt in full be given.

Appeal from Jasper Circuit Court.—*Hon. Hugh Dabbs,* Judge.

Affirmed.

*H. L. Shannon* for appellant.

(1) Maintenance is unlawful under the law of Missouri. Duke v. Harper, 66 Mo. 51; Breeden v. Ins. Co., 110 Mo. App. 312; Phelps v. Manecke, 119 Mo. App. 139. (2) A civil action for damages resulting from maintenance will lie at common law.

Breeden v. Ins. Co., 110 Mo. App. 312; 5 Am. and Eng. Ency. Law (2 Ed.), 821; Harris v. Brisco, 17 Q. B. Div. 511; Wallis v. Portland, 3 Ves. Jr. 502; Pechell v. Watson, 8 M. & W. 691; Bradlaugh v. Newdgate, 11 Q. B. Div. 1; Goodyear Dental Vulcanite Co. v. White, Fed. Cases, 5602; Fletcher v. Ellis, Fed. Cases, No. 4, 863a; Lynn v. Moss, 62 S. W. 712. (3) Where an outside party wholly without interest in the matter out of which a legal controversy arises employs lawyers and gets up evidence at his own expense in behalf of one of the parties, he is guilty of maintenance. Phelps v. Manecke, 119 Mo. App. 144. (4) A contract to maintain another is void. Phelps v. Manecke, 119 Mo. App. 139; Burt v. Place, 6 Cow. 431; Underwood v. Riley, 19 Wis. 412. (5) Where the interest of a stranger to a lawsuit arises out of a contract which also obligates such stranger to prosecute or defend the suit, the interest is not such as will justify maintenance. Campbell v. Jones, 4 Wend. 310; Railroad v. Elect. Co., 74 Ill. App. 465; Burt v. Place, 6 Cow. 431. (6) It is not essential that the services should be purely voluntary in order that the one who assists in prosecuting or defending a suit may be guilty of maintenance. One may be guilty of maintenance although he has been, or is to be, compensated for his services. Underwood v. Riley, 19 Wis. 434; Getchel v. Welday, 4 O. Dec. 65; Lucas v. Allen, 80 Ky. 681; Phelps v. Manecke, 119 Mo. App. 139. (7) It is not essential to the offense of champerty that there be a suit pending at the time the champertous agreement is made. Rust v. Lance, 14 Am. Dec. 172. (8) A contract in the alternative, one part being non-enforcible on account of being illegal, cannot be enforced as to the other part. Andrews v. Broughton, 78 Mo. App. 188. (9) While the chief sources for determining the public policy of a nation are its constitution, laws and judicial decisions, the court should not hesitate to declare a contract illegal, merely because no statute

or precedent prohibiting it can be found. 15 Am. and Eng. Ency. Law (2 Ed.), 933. (10) On the ground of public policy a contract to exempt the master from the consequences of his negligence is void. Blanton v. Dold, 109 Mo. 75; Settle v. Railroad, 127 Mo. 343; Bair v. Heibel, 103 Mo. App. 635. (11) Under an employer's liability policy insuring against loss or damage by reason of liability, there is no liability on the policy until a judgment has been recovered against and paid by the assured. 4 Current Law, 190; Finley v. U. S. Casualty Co., 83 S. W. 2. (12) The settlement of one cause of action will not operate as a release of a separate and distinct cause of action between the same parties, even though both cases grow out of the same transaction. ''On a question of settlement there are no artificial mysteries or technical pitfalls. The question to determine is one of mere facts, whether there has been a settlement of the thing in litigation.'' Gens & Tiede v. Hargadine & Co., 56 Mo. App. 256. (13) *Dicta*, expressions of opinions by the appellate court on matters, the disposition of which was not required, create no estoppel. 26 Am. and Eng. Ency. Law (2 Ed.), 192, 193. (14) The release purports to release only the judgment. The record is silent concerning any other liability in favor of the plaintiff and against either the insurance company or the mining company. Could the payment of $1,000 in full satisfaction of the judgment be an accord and satisfaction of plaintiff's demand against defendant for maintenance? An accord and satisfaction is a proposition made and accepted and executed upon an agreement that it shall satisfy a demand. It does not operate by way of estoppel, but by agreement. 1 Am. and Eng. Ency. Law (2 Ed.), 408. There was no agreement that plaintiff's cause of action against defendant for maintenance should be satisfied. Therefore, there was no accord and satisfaction. Bigbee v. Coombs, 64 Mo. 529; Gens & Tiede v. Hagardine &

Co., 56 Mo. App. 254. A release may take place by implication, by construction or by estoppel. 24 Am. and Eng. Ency. Law (2 Ed.), 285. The case at bar does not seem to be analogous to any of the cases of release by implication. The mining company and the insurance company were not joint debtors nor joint trespassers. It could hardly be said that the mining company was guilty of maintenance in defending its own suit. In fact, it did not defend its own suit. But even if it could be said that it participated in the wrong perpetrated by the insurance company against the plaintiff, still it would not follow that it or the insurance company had been discharged from liability for damages on account of that wrong. Even a full payment of plaintiff's judgment would not have satisfied plaintiff's claim for damages for maintenance against the insurance company, nor against the mining company, if such claim could be made against the mining company. He would still be entitled to compensation for such expense in prosecuting his suit against the mining company as was occasioned by the unlawful interference of the insurance company in the defense of that suit, and to compensation for delay in the payment of his damages. It would follow that there was no release by construction. Bigbee v. Coombs, 64 Mo. 529; 24 Am. and Eng. Ency. Law (2 Ed.), 285. Will the principles of estoppel applied to the facts of this case operate to discharge plaintiff's demand against the insurance company? If a judgment in favor of plaintiff in this case would operate to set aside and cancel "the agreement that the said mining company would release this defendant from any and all further liability under the said policy," then plaintiff might be estopped from prosecuting this suit. But since defendant procured its release from the mining company for and on account of the policy of insurance in consideration of the payment of $1,000, and said release is the only consideration suggested by

the record as inducing the defendant to pay said $1,000, defendant got all it contracted for in consideration of its $1,000, and it is not in a position to claim anything more. Perhaps the next time it would require plaintiff to further agree to release it from damages for maintenance, but it did not do it this time.

*Chas. F. Krone, amicus curiae.*

Did or did not the payment of the one thousand dollars operate as a discharge of respondent from any cause of action for maintenance which appellant might otherwise still have a right to enforce? This money was paid by the indemnity company after the controversy respecting the premiums and its continued liability had arisen and was understood between it and the mining company to be in full release of further liability under the policy. It was paid directly to appellant, but on account of the mining company, and after the indemnity company had, through its chosen attorney, conducted the entire defense of the personal injury suit. All of this the appellant knew. There was no mention of any complaint on the part of the appellant on the score of maintenance, and there is nothing to show that any possible suit on that ground was contemplated by any of the parties to the transaction. Had such a possibility been suggested it is most probable that the indemnity company would have made some effort to secure a specific release for such cause or refused payment unless such a release were given. Whatever negotiations may have been had, the whole transaction was finally embodied in the following entry of record in the suit of appellant against the mining company: "In consideration of the insolvency of the Big Circle Mining Company and one thousand dollars ($1,000) to plaintiff in hand paid, the judgment on this page is hereby released and full satisfaction thereof acknowledged, and the sheriff is hereby

authorized to release to the defendant any and all property levied upon under and by virtue of execution issued on said judgment. Dated this May 20, 1904. Witness my hand and seal. J. C. BREEDEN.'' Here is an express statement of what the money was paid to discharge, a statement made by both the appellant and respondent, for it is made physically by the former at the procurement of the latter. As a mere writing, therefore, it would be taken to reduce previous negotiations to a certainty which could not be varied by oral testimony. But this is not only a writing, but a solemn entry of record in satisfaction of a judgment of a court of record. It is conclusive of what it purports and exclusive of any and all variations by evidence *in pais.* But there is nothing in the oral evidence even to suggest that appellant, in addition to his release of this judgment for personal injuries, was to release a cause of action for maintenance. No such matter was shown to be in the minds of the parties. Why then should a release for maintenance be raised by implication upon satisfaction of injury for negligence, even if the inviolable writing of record be ignored? Why raise an estoppel, when its subject-matter was not thought of and when the money was certainly not paid even on the expectation of a release for maintenance? The appellant cared not whence the money came which he accepted nor what liabilities or controversies it settled between the indemnity and mining companies. Appellant had no rights under the indemnity contract at all. Why should he be put to an election to decide whether the policy was or was not still in force? It is absurd so to contend. Nor does it matter that the money was paid directly to him without the intermediation of the mining company. Upon none of these facts could the inference of fact possibly arise that he intended by entering satisfaction in an action for negligence to release the indemnity company from a cause of action for maintenance or that it so under-

stood his intention.  It is true that there was but one
transaction, but a settlement for maintenance was no
part of it.  While the discharge of one of several joint
tortfeasors will discharge all, it must be by express
release or accord and satisfaction and cannot be by
inference or implication.  It would do violence to every
established principle of law to force any such general
rule upon the facts here in evidence to which it is utter-
ly inapplicable.  The contention of respondent on this
score is unsound and must be condemned.  Walsh v.
Bishop, Cro. Car. 243 (overruling original case of
Parker v. Lawrence, Hobart 70) ; Farrell v. Forest, 2
Saunders  48; Solomon v. Smith, 1 Saunders  206;
Bailey v. Berry, 8 Am. Law Reg. 270; McLelland v.
Cumberland Bank, 24 Maine 566; Merchants Bank v.
Curtis, 37 Barb. 320; McAllister v. Sprague, 34 Maine
297; Tuckerman v. Newhall, 17 Mass. 581; Shaw v.
Pratt, 22 Pick. 305; Solly v. Forbes, 2 B. & B. 46;
Snow v. Chandler, 10 N. H. 95; Brown v. Marsh, 7
Vt. 327; Hitchcock v. Thornland, 3 Leonard 122; Lacy
v. Kynaston, 1 Lord Reg. 689; Dean v. Newhall (Lord
Kenyon), 8 T. R. 168; Couch v. Mills, 21 Wend. 424;
Frick v. Green, 5 Barb. 455; Smith v. Bartholomew,
1 Metc. 276; Rowley v. Stoddard, 7 Johns. 207; Durell
v. Wendell, 8 N. H. 369.

*Seddon & Holland* of counsel for respondent.

(1)    There is no evidence in the record that the
alleged act of maintenance on the part of respondent
resulted in any damage to appellant.  In order to re-
cover on the ground of tort a plaintiff in a case must
not only show a violation of duty on the part of de-
fendant, but also that such violation proximately re-
sulted in damage to him.  Warner v. Railroad, 117 Mo.
125.  (2) Whatever cause of action, if any, appellant
ever had against respondent on the ground of alleged
maintenance has been fully released by the acceptance

of appellant of one thousand dollars from respondent. Chicago Herald Co. v. Bryan, 195 Mo. 576; Hubbard v. Railroad, 173 Mo. 255; Bigelow on Estoppel, 673, 685, 686, 687; Bless v. Jenkins, 129 Mo. 647; Clyburn v. McLaughlin, 106 Mo. 521; Light v. Railroad, 89 Mo. 108; Bush v. Bush, 89 Mo. 360; McLean v. State, 8 Herck 23; Coleman v. Pike, 83 Ala. 326; Cooms v. People, 76 Ill. 383; Branch v. Jesup, 106 U. S. 468; Perryman v. Greenville, 51 Ala. 507; Morris v. State, 47 Tex. 583; Fula v. Dayon, 64 Wis. 564. (3) Policies of insurance indemnifying employers against loss, growing out of liability for accidents to employees, are not contrary to public policy. Railroad v. Southern Ry. News Co., 151 Mo. 373; Phoenix v. Erie Trans. Co., 117 U. S. 312; Cal. Ins. Co. v. Union Compress Co., 133 U. S. 387; Hartford Ins. Co. v. Railroad, 175 U. S. 91; Railroad v. Guarantors Liability Co., 60 N. J. L. 246; Railroad v. Home Ins. Co., 64 Minn. 61; Railroad v. Merchants Trust & Dep. Co., 34 Atl. 788; American Casualty Ins. Co.'s Case, 82 Md. 535. (4) The provision of the policy by which respondent is authorized to conduct the defense of any action brought against appellant by employees is not violative of public policy. Where a party has any interest in the subject-matter or in the result of a suit he is not guilty of maintenance if he aids in the defense thereof. 5 Am. and Eng. Ency. Law, 824-825; Davies v. Stowell, 78 Mich. 334; Goodspeed v. Fuller, 46 Me. 141; Gowan v. Norvell, 1 Me. 292; Gilman, Son & Co. v. Jones, 87 Ala. 691; McCall v. Capehart, 20 Ala. 520; Call v. Calef, 13 Metc. (Mass.) 362. (5) If a party has reasonable ground to believe that he has any interest in a suit brought against another, he is not guilty of maintenance if he takes part in the defense thereof. Cases under preceding heading; also: Bradlaugh v. Newdegate, 11 Q. B. Div. 1; Lewis v. Broun, 36 W. Va. 1.

*W. R. Robertson* for respondent.

(1)  It is not now, and never has been, the public policy of this State to prohibit insurance of the character complained of in this case.  Railroad v. Southern Ry. News Co., 151 Mo. 373; Railroad v. Ordelheide, 172 Mo. 444; Railroad v. Ordelheide, 88 Mo. App. 592; Lehndorf v. Shields, 13 Mo. App. 488; Hutchinson v. Dorin, 23 Mo. App. 578.  (2)  Neither have other States, so far as the decisions of their courts of last resort and the Federal courts disclose, announced the existence of such a public policy, but on the contrary approve such insurance.  Insurance Company v. Railroad, 175 U. S. 91; Ins. Co. v. Railroad, 117 U. S. 312; Ins. Co. v. Union Compress Co., 133 U. S. 387; Gould v. Brock (Pa.), 69 Atl. 1122.  (3)  The public policy of this State is further evidenced by the fact that the third subdivision of Sec. 7945, R. S. 1899, provides for this kind of insurance; sections 7963, 7989 and 7990 authorize licenses to issue to foreign companies to do business in this State.  The Attorney-General is made the legal adviser of the Superintendent of Insurance by section 7840; section 8043 provides for the taxation of such foreign companies, and appellant admits that respondent was duly licensed and authorized to transact business in this State.  Insurance of the character respondent wrote in this instance is contemplated by said section 7945.  Employers' Liability Assur. Corp. v. Merrill, 155 Mass. 404.  (4)  If it were against the public policy of any State to allow the business of employers' liability insurance to be conducted, then no recovery should be allowed in the courts on causes of actions based on such policies, but here are a very few of the cases holding them maintainable, although the question of public policy was not raised or discussed. Fuller Bros., etc., v. Fidelity & Casualty Co., 94 Mo. App. 490;

Kelley v. London Guar. & Accident Co., 97 Mo. App. 623; Woolman v. Fidelity, etc., 87 Mo. App. 677; American Steam Boiler Co. v. Chicago, etc., 57 Fed. 294; Travelers Ins. Co. v. Lumber Co., 83 Fed. 977; St. Louis Dressed Beef, etc., Co. v. Maryland Casualty Co., 201 U. S. 173. (5) On page 12 of the printed record in this case appears the copy of the release by appellant herein of his judgment of $3,500 against the mining company, the insured under respondent's policy, reciting the insolvency of defendant therein and acknowledging the receipt of $1,000 in full satisfaction of the said judgment; at page 17 of said record appears the admission of his counsel that this $1,000 was paid by the respondent herein, and in respondent's amended answer herein, which is not denied, it is alleged that the payment was made, not only to settle the controversy between respondent and the insurance company, but for the purpose of satisfying and releasing the claim of appellant against the mining company, and that it was so accepted by appellant. This unquestionably forecloses the right of appellant to further complain. Dalrymple v. Craig, 149 Mo. 345; Chicago Herald Co. v. Bryan, 195 Mo. 587.

WOODSON, J.—The plaintiff instituted this suit against the defendant in the circuit court of Jasper county to recover the sum of $4,650, damages alleged to have been sustained by him through the unlawful and wrongful maintenance of a certain suit instituted by him against the Big Circle Mining Company, a corporation of the same county, which had for its object the recovery of $5,000 damages for personal injuries alleged to have been sustained by him through the negligence of said mining company.

There was a trial had in the circuit court, which resulted in a judgment in favor of the defendant, and from which the plaintiff duly appealed.

The defendant is what is commonly known as an employer's liability insurance company, and was, at and prior to the issuance of the policy referred to hereafter, duly licensed to do business in this State.

On and prior to October, 1901, said mining company was engaged in operating a mining plant in said county, and, as such, applied to and procured from defendant the policy of insurance mentioned in the evidence, the material parts of which are as follows:

"Does hereby agree to indemnify Big Circle Mining Co., of Oronogo, county of Jasper, State of Missouri (hereinafter called 'The Assured'), for the term of six months beginning on the 8th day of October, 1901, at noon, and ending on the 8th day of March, 1902, at noon, Standard time.

"Against loss arising from legal liability for damages on account of bodily injury or death suffered by any employee or employees of the assured resulting from any and every accident of whatsoever nature or cause happening in, upon or about the premises of the assured as described herein and in the application herefor; but the liability of the company in respect to any one employee suffering injury or death shall in no case exceed the sum of twenty-five hundred dollars, nor shall the total liability of the company in respect to any one accident resulting in injury to, or the death of several employees in any event exceed the sum of ten thousand dollars.

"It is expressly warranted and agreed

"1. That the company's liability for accidents caused by or happening about any elevator plant or caused by the explosion, rupture or collapse of any steam boiler or boilers is limited to such elevator plant and boilers as are described and enumerated herein and in the application hereto.

"2. That upon the occurrence of an accident, whether any claim be made in respect thereof or not, the assured shall give immediate notice in writing of

such accident to the company, addressed to the manager for the United States at the office of the company in New York, N. Y., or to the duly authorized representative of the company for the locality in which this policy is issued. If thereafter the assured shall receive notice of any claim growing out of an accident, duly reported to the company as before provided, or if any legal proceedings to enforce such a claim, he shall give immediate notice thereof to the company in like manner.

"3. That if any legal proceedings are taken to enforce a claim against the assured, covered by this policy, the company shall, at its own cost, undertake the defense of such legal proceedings in the name and on behalf of the assured and shall have the entire control of such defense. But if the company shall offer to pay to the assured the full amount for which the company is liable in respect to the claim sought to be enforced, it shall not be bound to defend any legal proceedings nor be liable for any costs or expenses which the assured may incur in defending the same. The assured shall at all times, under the direction of the company, render all reasonable and necessary assistance to enable the company to effect settlements or to properly conduct a defense or to prosecute an appeal.

"4. That the company may undertake at its own cost the settlement of any claim, duly reported to it as before provided, and the assured shall not, except at his own cost, settle any claim nor incur any expense without the consent of the company thereto previously given in writing; provided, however, that such immediate medical and surgical relief to the injured may be furnished as may be imperative at the time of the accident and reasonable expenses thus incurred, shall be deemed a part of the liability of the company.

"5. That this policy may be cancelled by the company at any time; it may also be cancelled by the assured provided the premium has been paid. If cancelled by the company it shall retain a pro rata premium for the time the policy has been in force; if cancelled by the assured the company shall, after deducting twenty-five per centum of the whole of the premium for expenses, retain a premium computed according to the customary short rates based upon the amount of pay-roll expended up to the date of cancellation.

"6. That the premium is based upon the estimated annual pay-roll to be expended by the assured during the term of this policy. If the wages paid in that period exceed the amount on which the premium has been paid there shall be paid to the company a further premium for such excess, and if the pay-roll expended is less than that estimated, the company will return to the assured the unearned premium pro rata; provided, however, that the premium to be retained by the company shall in no event be less than the sum of fifty dollars.

"7. That the company shall have the right at all reasonable times to examine the books of the assured so far as they relate to the wages paid employees; and the assured shall, when so requested, furnish the company with a sworn statement of the total amount of wages paid to his employees during any period within the term of this policy which may be specified by the company.

"8. That the assured shall not, in any case whatsoever, voluntarily assume by contract or otherwise any liability for loss on account of bodily injuries, fatal or non-fatal, to any employee or employees, except by consent of the company, evidence of the indorsement of such consent signed by the manager and attorney for the United States.

"15. That in case of loss under this policy, the company shall be subrogated to all claims or rights of the assured in respect to such loss against any person or persons, and the assured shall execute any and all papers required to secure to the company said rights."

The policy was written for a period of six months, beginning on October 8, 1901, for which a premium of $88.74 was paid by the mining company to respondent.

In January, 1902, appellant claimed to have received an injury in the mining company's mill by reason of breakage of an eye in one of the bumpers. This respondent was immediately notified of the accident by the mining company, and respondent, acting under the provisions of its policy, proceeded to cause an investigation to be made of the accident. Soon thereafter the appellant commenced a suit in the circuit court of Jasper county, Missouri, against the mining company, seeking to recover from it $5,000 damages. The respondent, acting in pursuance of the provisions of the policy, employed an attorney and undertook the defense of said suit, which, in the trial thereof at the June term, 1908, resulted in a judgment against the mining company in the sum of $2,500. From this judgment, in due course, an appeal was taken to the Kansas City Court of Appeals, and the judgment of the circuit court was reversed and the cause remanded. On a second trial in the circuit court plaintiff recovered a judgment for $3,500. When the first judgment was recovered the mining company was solvent and able to pay the $2,500 judgment. It was also solvent when the cause was first reached for trial after it had been remanded by the appellate court, but the defendant in this cause, the insurance company, through its attorney, caused the trial to be postponed from time to time, and when plaintiff finally recovered judgment for $3,500 the mining company was insolvent; and

on account of its insolvency plaintiff accepted $1,000
in full satisfaction of his judgment for $3,500.

It was admitted that the plaintiff in this case
received one thousand dollars in satisfaction for his
judgment for $3,500 and costs and that that one
thousand dollars was paid by the defendant in this
case for and on account of the Big Circle Mining
Company, and that at the time payment was made
the plaintiff in this case knew it was being paid by
the defendant in this case.

It was admitted that at that time the Big Circle
Mining Company was contending that the insurance
policy in question was a valid and subsisting obliga-
tion and undertaking of the defendant in this case,
and that the insurance company was denying it was,
under a claim that all the premium stipulated for in
the policy had not been paid, and that in settlement
of this judgment by the payment of one thousand dol-
lars, that controversy between the Big Circle Min-
ing Company and the insurance company, defendant
in this case, was settled, and the defendant in this
case, the insurance company, was released by the Big
Circle Mining Company from all further additional
liability on account of the said insurance policy. And
it was admitted that the plaintiff knew and under-
stood that the Big Circle Mining Company was re-
leasing the insurance company on account of the obli-
gation contained in the insurance policy for and in
consideration of the payment of that one thousand
dollars.

The attorney defending plaintiff's suit against
the Big Circle Mining Company was selected and paid
by the defendant in this case, and all the expenses of
making said defense and of prosecuting the appeal
were paid by the defendant in this case.

The Big Circle Mining Company took no part in
nor paid any of the expenses incurred in the defense
of the plaintiff's suit against it, and when the insur-

ance company, the defendant herein, finally abandoned the defense in that case, no further defense was made thereto, and the plaintiff then obtained his judgment against it for the sum of $3,500, as aforesaid.

## OPINION.

I. By this suit appellant seeks to recover of respondent the sum of $2,650 actual damages and $2,000 punitive damages for its alleged unlawful and wrongful maintaining the Big Circle Mining Company in a suit instituted by him, in the circuit court of Jasper county, against it to recover $5,000 damages for personal injuries sustained by him through the latter's negligence in furnishing him defective and dangerous appliances with which to work.

The record disclosed that at the time he received the judgment of $2,500 against the Mining Company it was solvent, and that he could have collected the amount of his judgment had not the respondent appealed the cause to the Court of Appeals; and that if the respondent had not further defended the suit of appellant against the mining company after it had been remanded to the circuit court for a new trial, he could have recovered his judgment for $3,500 and collected the same before the mining company became insolvent.

In answer to the foregoing proposition, respondent contends that it is not guilty of maintenance within the technical legal meaning of that term, for the reason assigned that it had such an interest in the litigation by virtue of the policy of insurance issued by it to the mining company as authorized it to defend the suit instituted against the mining company, in that it was obligated thereby to indemnify the mining company against whatever damages appellant might recover against it, not exceeding the amount stated in the policy.

Upon the other hand, counsel for appellant contends that the said policy of indemnity is absolutely null and void and of no force or effect whatever, for the reason, first, that it is obnoxious to public policy, and, second, because it violates the law of maintenance.

Those two contentions sharply present the main legal propositions for our determination, and we will consider them in the order stated.

Counsel for respondent took the broad ground that it is not now, nor has it ever been, against public policy of this State to engage in insurance of the character complained of in this case; and cites in support thereof the following cases: Railroad v. Southern Ry. News Co., 151 Mo. 373; Railroad v. Ordelheide, 172 Mo. 436; Lehndorf v. Shields, 13 Mo. App. 486; Hutchinson v. Dornin, 23 Mo. App. 575.

In the first case cited the railroad company entered into a contract with the news company granting it the right to sell newspapers, books and confections by its agents upon the road's trains, and it was stipulated between them that the news company was to indemnify the railroad company against any loss which it might sustain by reason of the duty it owed said agents as a common carrier of passengers on its trains. In discussing that question this court, in speaking through BRACE, P. J., on pages 384 to 389, used the following language:

"It is contended that the contract sued on is against public policy and it is for that reason void. The argument in support of this contention is made from the standpoint of the deceased news agent and his relation to the railroad company, and is predicated on the well-settled principle that a common carrier cannot by contract limit its liability to a passenger for the negligence of its servants. It may be conceded that the news agent in this case was a passenger on the train in which he lost his life and that the com-

pany could not by a contract such as this relieve it-
self of its duty to him as a common carrier of pas-
sengers, or of its liability to him for the negligence
of its servants. [Jones v. Railroad, 125 Mo. 666;
Magoffin v. Railroad, 102 Mo. 540; Mellor v. Railroad,
105 Mo. 455; Voight v. Railroad, 79 Fed. 561, and
cases cited; Railroad v. Lockwood, 17 Wall. 359; Starr
v. Railroad, 67 Minn. 18.] But the contract in ques-
tion is not with a passenger, it is not with a person
to whom the company owed a duty as a common
carrier of passengers, nor does it in terms, as it could
not in effect, attempt to relieve the railroad company
from any of its duties or liabilities as such. The con-
tract is simply one of indemnity by which the news
company agreed for a valuable consideration to in-
demnify the railroad company against loss which the
latter might sustain by reason of the duty it would.
incur to the news agent, as a common carrier of pas-
sengers, in carrying out the contract. In Phoenix Ins.
Co. v. Erie Transportation Co., 117 U. S. 324, it was
held by the Supreme Court of the United States that
'no rule of law or public policy is violated by allow-
ing a common carrier, like any other person having
either the general property or a peculiar interest in
goods, to have them insured against the usual perils,
and to recover for any loss from such perils, though
occasioned by the negligence of his own servants. By
obtaining insurance, he does not diminish his own
responsibility to the owners of the goods, but rather
increases his means of meeting that responsibility.' In
the subsequent case of California Ins. Co. v. Union
Compress Co., 133 U. S. 415, that court was asked
to review its announcement of this principle, to which
it was replied: 'Nor are we disposed to review our
decision that common carriers can insure themselves
against loss proceeding from the negligence of their
own servants. The doctrine announced in the case cited
has been referred to with approval in the subsequent

cases of Orient Ins. Co. v. Adams, 123 U. S. 67, 72, and Liverpool Steam Co. v. Phoenix Ins. .Co., 129 U. S. 397.' That this doctrine is supported by the great weight of authority is manifested by the cases cited in the above cases, by others in the brief of counsel for the plaintiff and by some of those cited by counsel for the defendant. While in the great majority of the cases the principle has been applied to contracts of indemnity against damages for the loss of property, that it is equally applicable to like contracts against losses for injuries to passengers, has in two very recent cases been directly decided: American Casualty Ins. Company's Case (1896), 82 Md. 535; Railroad v. Mercantile Trust & Deposit Co., 34 Atl. 778; Railroad v. Guarantors' Liability Indemnity Co. (1897), 60 N. J. L. 246. In these cases the question was maturely considered, and thoroughly discussed, and in each after a review of the authorities the conclusion reached was that 'a contract to indemnify a common carrier of passengers against losses occurring from injuries to passengers carried by it, is not invalid as against public policy, because it covers losses resulting from its negligence, or negligence of its servants.' To the trenchant argument in support of this conclusion of McSHERRY, C. J., who delivered the opinion of the Maryland Court of Appeals in the first case, and which was highly commended and followed by the Supreme Court of New Jersey in the second, no additional force could be added by any words of ours. We shall therefore content ourselves for argument on this branch of the case with the following extract from that opinion: 'Whilst the carrier will not be permitted by contract or otherwise to exempt himself from liability for losses caused by his own negligence or the negligence of his servants, there is no reason of public policy which prohibits him from contracting with a third person for insurance against these very same losses. Consequently he may by insurance indemnify

himself against loss of or injury to property intrusted to his care, even where the loss or injury is caused by his own or his servants' negligence. This was decided in Phoenix Ins. Co. v. Erie Trans. Co., 117 U. S. 324; and the ground upon which the decision was based was that such insurance did not diminish the carrier's own responsibility to the owner of the goods, but increased the means of meeting that responsibility. Notwithstanding such insurance the carrier remains liable to the owner or shipper of the goods, and by insuring them he merely contracts, as in every other instance of a reinsurance, with some one else for reimbursement for such loss. The doctrine announced in the Phoenix Ins. Company's case, supra, was affirmed in Cal. Ins. Co. v. Union Compress Co., 133 U. S. 387, and is the settled law of the land. A reasonable restriction by contract of his common law liability and an insurance by the carrier of goods against loss are recognized by the law and are not in contravention of its policy to-day, whatever that policy might have been heretofore. It is obvious that a carrier of passengers cannot by contract restrict, diminish or limit that obligation to the public, or that duty to the passenger, which requires the exercise of the highest degree of care and diligence on his part. A contract which stipulates for or agrees to such relaxation, and therefore contemplates immunity from the carrier's own negligence, would be utterly void; precisely as would a contract purporting to relieve a carrier of goods from liability for losses occasioned by his own or his servant's negligence. But the policies before us are not contracts of that character. Neither in express terms nor by implication do they profess or purport to abridge, in any way, the carrier's common law liability for injuries to passengers, employees or strangers. These policies leave that liability precisely where and as complete as it was before they were written. They contain no provision im-

pugning or questioning in the slightest degree the full
measure of that responsibility. It is perfectly mani-
fest, therefore, that they are not in terms contracts
restricting or attempting to restrict the carrier's con-
ceded liability; and if they contravene public policy
at all, it must and can only be incidentally and in-
directly. This is all that can be imputed to them.
But they are all, it is alleged, repugnant to public
policy because by furnishing the carrier with a fund
with which to reimburse himself for losses caused by
his own negligence, their inevitable tendency or effect
is to induce less vigilance, or to promote greater care-
lessness on the part of the carrier. Precisely the same
reasoning would invalidate, as repugnant to public
policy, every species of fire and marine insurance.
To the extent that a fire insurance policy affords an
individual protection against loss, to exactly the same
extent it may be said the assured will become in-
different in guarding against casualties from fire. And
in so far as a carrier may have a policy covering goods
and insuring them for his own benefit against losses
arising from his or his servant's negligence, just so
far will he be either tempted to be negligent, or be-
come indifferent as to vigilance. But in neither in-
stance can it be said that because a temptation to be
negligent may possibly result from the possession of
an insurance policy, the contract of insurance neces-
sarily begets negligence or conflicts with public policy.
Nor can we assume as an unvarying rule, of which
judicial notice will be taken, that a carrier of pas-
sengers who has secured an indemnity to reimburse
himself for losses which his own negligence may pro-
duce, will, merely because and solely in consequence
of having such indemnity—which at best is but limited
and partial—necessarily disregard the duty to ex-
ercise the highest degree of care. And unless it be
assumed as a postulate that the mere possession of
an indemnity will of itself necessarily and invariably

produce negligence, it does not logically follow that such a policy or indemnity is even incidentally or indirectly repugnant to public policy. The indemnity in no way affects the liability of the carrier to the person injured.' The only distinction between those cases and the one in hand is that in them the contracts were formal contracts of insurance with insurance companies, while the contract in question is a contract of indemnity by a news company. But a mere contract of insurance is nothing more nor less than a contract of indemnity against loss, as is this with the defendant, and the principles governing must be the same in each, and as nothing can be predicated of the contract in this case which could interefere with or affect the liability of the carrier to the person injured, there is nothing in it to take it out of the principle of those cases, or render it obnoxious to public policy. Hence we conclude that this contract cannot be avoided as against public policy.''

The other cases cited seem to announce the same principles of law. In fact, we do not understand counsel for appellant to contend that those cases do not declare the law to be as insisted for by counsel for respondent; but he most earnestly challenges the correctness of the conclusions therein reached, and requests this court to reconsider the question. Because of the great public importance involved therein, we have concluded to do so.

The argument made in support of respondent's contention is bottomed upon the broad principle of the common law, which is to the effect that the master cannot by contract made with his servant limit his liability to the latter for injuries sustained through the negligence of the former; and counsel insists that all contracts entered into by the master and third persons which relieve or tend to relieve or to reimburse the master for damages imposed by law upon him as compensation for injuries sustained by the servant

through the negligence of the master are also null and
void, because they tend to encourage negligence.

In discussing this question the Supreme Court of
the United States, in the case before mentioned and
quoted from, in upholding such a policy, used this lan-
guage: "Neither in express terms nor by implication
do they profess or purport to abridge, in any way,
the carrier's common law liability for injuries to pas-
sengers, employees or strangers. These policies leave
the liability precisely where and as complete as it
was before they were written. They contain no pro-
visions impunging or questioning in the slightest de-
gree the full measure of that responsibility. It is per-
fectly manifest, therefore, that they are not in terms
contracts restricting or attempting to restrict the car-
rier's conceded liability; and if they contravene pub-
lic policy at all, it must and can only be incidentally
and indirectly. This is all that can be imputed to them.
But they are all, it is alleged, repugnant to public
policy because by furnishing the carrier with a fund
with which to reimburse himself for losses caused by
his own negligence, their inevitable tendency or effect
is to induce less vigilance or to promote greater care-
lessness on the part of the carrier. Precisely the
same reasoning would invalidate, as repugnant to
public policy, every species of fire and marine in-
surance."

With all due respect for the opinion of that great
court, yet we challenge the soundness of the logic
of certain portions of the argument advanced and
the correctness of the conclusions reached therein re-
garding this question. In our judgment when a car-
rier knows that a third person is required to furnish
the means from his own pocket with which to pay for
the injuries done by his negligence to the passenger,
then that consideration has a direct and potent in-
fluence in encouraging negligence on the part of the
carrier.

Carelessness is a relative term and is the lack of due care. The degree of care required to be exercised in a given case depends entirely upon the degree of responsibility resting upon the carrier, and that responsibility is financial, and may also be a moral one, or both, but with the financial alone has the law to deal; and we will therefore confine our remarks to it alone. The degree of responsibility required of a carrier depends largely upon the character of the things to be transported; if persons are to be carried, then the carrier must use the highest degree of care known to that branch of the law, for the reason that in such case his responsibility is of the highest character. If property is to be carried, then the degree of responsibility depends upon the value thereof; if diamonds or money, the responsibility is greater than if the same quantity of China marbles or blank paper were being carried; and, consequently, the degree of care required would be commensurate with the degree of responsibility resting upon the carrier. This is not only elementary law, but it is in accordance with the universal custom and mode of doing business throughout the country, if not the world. Those principles are recognized and observed by all ordinarily prudent persons; and that mode of conducting business is grounded in and springs from the principle of self-interest, which is ever present and uppermost in the business transactions of life. If we turn to the common carriers of passengers, at a glance we see specially constructed trains, equipped with the best and most modern appliances, in which passengers are carried. Those trains are manned with the highest class of employees engaged in the service, selected with reference to their intelligence, experience, skill and fidelity to duty. Under that condition of things the question naturally presents itself, why is that? The answer is self-interest, prompted chiefly by the highest degree of responsibility resting upon a common carrier, and must be dis-

charged by the exercise of the highest degree of care known to that class of business men.  [Lemon v. Chanslor, 68 Mo. 340.]  The desire to retain and increase the patronage of the carrier also enters into the character of the trains and appliances used.

We see the same principle illustrated in the transportation of precious articles where custom and the law require the consignor, when asked, to disclose the value of the article shipped.  When that is done the degree of care is largely fixed by the value of the article, and if it be of little value, then the degree of care required is not so great as where it is of great value; and because of the difference in the responsibility incident to each, the law recognizes and permits the carrier to fix the charge to be paid for transporting the article in proportion to the degree of responsibility imposed upon him by the increased or decreased value of the article carried.

The same responsibility and care exist in the financial world.  An ordinarily prudent man carries a few dollars in his pocket and leaves small sums of money in his place of business, but the prudent business man would not carry with him or leave in his business house large sums of money.  When it devolves upon one to care for and safely keep thousands and millions of dollars neither he nor any prudent person would think of keeping it in any other place than in a bank; and the larger the sums the more attention would he give to the solvency of the bank and to the character of the vaults and other safe places where it is to be deposited.  In rural districts where large sums of money are not needed and never deposited, the safe and vaults of the average banker are inexpensive and but few of them are absolutely burglar proof, although so-called; but in the large cities where the great financial transactions of the world are conducted, requiring the use of millions of money, there you find the bank

building its vaults and safety deposits the strongest
and most secure that money can buy and the ingenuity
of man can design and construct. Why this increased
cost and security? The answer must be because of
the increased responsibility resting upon the city
banker; and due care requires of him that he provide
a place of security which is commensurate with the
degree of responsibility resting upon him.

The difference in the amount of money deposited
in each also determines the difference between the
degree of care each owes to their depositors. (I am
not using the words bank and depositor in the sense
of bailor or bailee, but in the broad sense that the
bank owes its depositors a duty to safely keep the
moneys deposited therein in order that they will not
be lost or squandered but will be safely preserved
with which to pay the depositors' checks and other
legal obligations when presented.)

This same custom and rule of business prevails
in the industrial circles. The larger the business and
the more money invested in the plant the higher degree
of intelligence is required to conduct it successfully;
and the more valuable, complicated and dangerous the
business is, or any department thereof, the greater is
the responsibility resting upon those intrusted with its
management; and in order to properly discharge those
responsibilities to the owner, and to the employees,
competent men must be selected to manage and con-
duct the same, and who will exercise that degree of
care toward the business and the employees as is com-
mensurate with the responsibility resting upon them.

From the foregoing observations it seems to me
to be perfectly clear that the financial or pecuniary
interest the carrier, the banker, the manufacturer and
the miner have at stake and invested in the business
very largely determines the degree of care and cau-
tion with which he conducts that business; that if he
has but slight interest in the business, then the degree

of care exercised by him will be commensurate with that interest; and if his interests are large, then the degree of care he will exercise will be increased in proportion to his holdings.

If the foregoing reasoning and conclusions are sound, which in my judgment cannot be questioned, then when a fund is provided by an insurance company for the use of the carrier with which to reimburse himself for the money he is required to pay out for injuries done his patrons, caused by his negligence, then the fund so furnished is for all practical purposes substituted for a like sum of his own money which otherwise would have been taken to compensate the passenger for the injuries so received, and to that extent, whatever it might be, whether great or small, the jeopardy to the financial interest of the carrier is removed and wiped out, and by the same act the financial responsibility of the carrier is reduced to the same extent, and the corresponding degree of care required of him to be exercised in favor of the passenger is likewise reduced to the same degree.

If that can be done, then the law will permit the carrier to accomplish by indirect means that which he cannot do by a direct contract. In other words, the law will not permit a carrier to relieve himself from his duties to his passenger by a direct contract; yet by this means it will permit him to do so, for all practical purposes, by permitting him to take out an insurance policy indemnifying himself against all damages he might be required to pay for personal injuries received by the passenger in consequence of his negligence.

In the former case the law will not enforce such a contract, because it would be against public policy, in this, the contract would relieve the carrier from all financial responsibility toward the passenger, and thereby induce him to exercise a smaller degree of care than he would exercise if he knew he would be held

financially responsible if he did not exercise the highest degree of care. If such contracts were enforcible, then the lesser and not the higher degree of care would be exercised by the carrier, and would thereby greatly increase the dangers to the traveling public. The law wisely recognizes that fact, and for that reason alone refuses to enforce all such contracts of release. Their enforcement is not withheld because of the financial loss the passenger would sustain if the courts should enforce them, but, as before stated, is for the purpose of inducing the carrier to exercise the highest degree of care toward the traveling public, which would not be done if he was not held financially responsible therefor. And in the latter case, should the law authorize the courts to enforce such indemnity contracts of insurance, then the law would authorize the courts to take with one hand from the pocket of the carrier the money with which to pay the passenger for the injuries received by him in consequence of the carrier's negligence, and with the other hand reimburse and pay back into the same pocket the money so taken therefrom. Under that view of the law, and if such policies are valid, then in both cases suggested all financial inducements to the carrier to exercise the highest degree of care would be absolutely withdrawn, and the traveling public would in each case be subject and exposed to exactly the same negligent conduct and dangers, no greater and no less; and, according to all principles of logic and sound reasoning, if the contract of release in the former case is against public policy and void on that account, then by the same principles all such policies of insurance must be held to be void also. And it is equally true if such policies are valid and not opposed to public policy, as contended for by counsel for respondent, then contracts releasing the carrier from the consequences of his negligent acts are also valid and should be enforced; but in our judgment both contracts do violence to sound prin-

ciples of public policy, and should alike be held invalid.

It is no answer to this argument to say, as was said by the court in the case before quoted from, that such indemnity "at best is but limited and partial," for the reason that the policy might be sufficiently large in amount to afford complete indemnity. But be that as it may, if the indemnity is only partial, then to that extent the responsibility and the corresponding degree of care required to be exercised are reduced to the extent of the indemnity, whether partial or complete. That is self-evident.

The court also said in that case that it would not be "said that because a temptation to be negligent may possibly result from the possession of an insurance policy, the contract of insurance necessarily begets negligence or conflicts with public policy." The same argument would apply equally well and with the same degree of force to a contract entered into with the carrier whereby he is released from all liability for injuries to the passenger in consequence of his negligence. The contract in the latter case would be no stronger temptation to the carrier to disregard his duty to the passenger than would the existence of the policy of insurance mentioned in the former. All contracts which attempt to relieve a person from the performance of his public duties prescribed by law are absolutely null and void, and it is wholly immaterial whether the person for whose benefit it is made has violated those duties or not. It is not the violation of the duty which vitiates the contract, but it is the provision of the contract which releases the carrier from the performance of his duties that vitiates the contract. [Burt v. Place, 6 Cowen 431.]

The same court also used the following fallacious argument in support of the conclusions reached in that case, to-wit: "Nor can we assume as an unvarying rule, of which judicial notice will be taken,

that a carrier of passengers who has secured an indemnity to reimburse himself for losses which his own negligence may produce, will, merely because and solely in consequence of having such indemnity—which at best is but limited and partial—necessarily disregard the duty to exercise the highest degree of care." In answer to that it is sufficient to say that the same argument, if sound, would uphold a contract entered into by the passenger and the carrier by which the carrier limited and restricted the duties he owes to the passenger. Nor could this court assume as an unvarying rule, of which judicial notice will be taken, that a carrier of passengers who has secured a contract releasing him from a part or all damages he may sustain on account of personal injuries which he may receive in consequence of the carrier's negligence, will, merely because and solely in consequence of having such release—which may be partial or in full—necessarily disregard the duty to exercise the highest degree of care.

I have stated this last proposition almost in the language the Supreme Court of the United States used in its argument upholding a policy of insurance indemnifying the carrier against losses which his own negligence might have produced. Yet the same court in that very same case expressly held "a carrier of passengers cannot by contract restrict, diminish or limit that obligation to the public, or that duty to the passenger, which requires the exercise of the highest degree of care and diligence on his part." If that argument of that court is sound and is sufficient to support a policy of insurance indemnifying the carrier against his own negligence, then as before stated, the same reason is sufficient to uphold the validity of a contract between the carrier and the passenger releasing the former from all care due the latter; and, if, upon the other hand, the reasoning of the court is not sufficient to support the contract

mentioned, then by parity of reasoning it must of necessity be insufficient to sustain the validity of the policy of insurance indemnifying him against his own negligence.

Nor do I concur with that court when it says "precisely the same reasoning .would invalidate, as repugnant to public policy, every species of fire and marine insurance." This quotation shows that the court has a complete misconception of the principle of law underlying the proposition under consideration. Fire insurance, for instance, is a contract made and entered into by and between the owner of property and the insurance company, whereby the pecuniary interest of the former in and to the property is secured against loss or damage by fire, as a rule regardless of the cause thereof, by the latter agreeing to pay to the former a certain sum of money in case the property is destroyed or damaged by fire. By this definition it is seen that the contract is wholly between the parties entering into the contract and relates to and affects no other property or persons except those mentioned in the policy; and that if a loss occurs under the policy they, alone, and no third person, or outsider, not a party to the contract of insurance, are damaged thereby, nor is the property of such third party damaged thereby; and when the indemnity stated in the policy is paid to the insured he is made whole according to the terms of the policy; consequently when that payment has been made no third person has any unsatisfied claim, either legal or moral, against the insurance company for injuries done to his person or damage done to his property in consequence of the fire, whatever the cause of its origin, for the obvious reason that he is no party to the contract of insurance, nor is his person or property either directly or indirectly affected by the contract or fire; and when the insurance money is paid by the company to the insured, the entire transaction in all of its

phases and bearings is completely closed. In other words, an ordinary contract of fire insurance is purely a matter of private contract wholly between the parties thereto, and affects only the property of the insured. But that is not the case in what is called indemnity insurance. This class of insurance is intended to indemnify the assured generally against the consequences of his own acts of negligence which result injuriously to the person or property rights of some third person and for which he is compelled to respond in damages. While there are no parties to the contract except the insurer and insured, yet the policy is not intended to nor does it insure the person or the property of the insured against the negligent acts of himself or those of any third person, but is intended to and does reimburse the insured for money which he may be compelled to pay to such third person for injuries inflicted upon his person or damages done to his property, caused through the negligence of the insured. So, it is thus seen, that before a cause of action can accrue under such a policy in favor of the assured, he must have been guilty of some negligent act which resulted in personal injury to such third person or in damages to his property, and the insured must have been compelled to pay to the third party the damages so sustained by him in consequence of the insured's negligence. From these observations it is perfectly clear that the insured, by taking out such a policy of insurance, is providing a fund in advance out of which he intends to reimburse himself for the sum he may be required to pay such third party, and thereby escape, as far as it is possible, the responsibility of his acts of negligence which result injuriously to third parties. This is one of the chief differences between the two classes of insurance under discussion. As before shown, fire insurance may and often does insure one's property against loss or damages thereto in consequence of his own negli-

gence, which in no manner can injure the rights of third persons, while in indemnity insurance of necessity the injury must be done to a third party through the negligence of the insured before the company becomes liable. But that is not the only material distinction between the two classes of insurance. In another place we endeavored to make clear that in fire insurance the contract and all of the results and incidents thereto existed exclusively between the insured and insurer, and that when a loss occurred under the policy, and payment of the damages was made by the insurance company to the insured, all persons and rights damaged by the fire were completely, both legally and morally, satisfied and paid. But that is not true in indemnity insurance, for if it be conceded that in personal injury cases the injured party or his representatives have been fully compensated from a moneyed standpoint by the person who caused his injury, yet that would not restore the injured party or his family to its *status quo,* for the obvious reason that if he is killed no power on earth can restore the life which had been uselessly sacrificed; and if he was a married man and of family, the payment of money to them would not restore the husband to the widow nor the father to the orphan. Money cannot compensate for the loss of society, love, care, and protection of the husband and father to the wife and child. And in case the injured person is not killed but seriously injured and crippled, then money could not compensate for the physical pain and mental anguish suffered by him, or compensate him for the joys and pleasures wrongfully taken from him, or repay the members of the family for the care and the heavy burden cast upon them by reason of the injury. These things are more dear and sacred to the family and more important to its well-being, comfort and protection than any reasonable moneyed consideration. These are matters which also vitally affect the State. It has

a vital interest in the life and limb of its citizens. It is of paramount importance to the State and to society that the lives of the citizens be protected and that their health and strength be preserved; otherwise, we would become a nation composed of cripples and of widows and orphans. When we view indemnity insurance in the light of the facts involved therein, and the many serious consequences incident thereto, then it is not a difficult matter to see and understand that such insurance, and fire and marine insurance, do not rest upon the same principle, nor does the former have for its object the same beneficent purposes which are intended to be and are accomplished by the latter kinds of insurance. The one is intended to reimburse the owner of property which is damaged or destroyed by fire or sea perils, while the other is founded upon the authorized negligence of the insured party and reimburses him for the damages he must pay in consequence of his authorized negligence, which of necessity must result in the death or personal injury to some third person, or damage done to or destruction of his property before any possible liability can attach to the insurance company under the terms of the policy issued. If the latter class of insurance does not encourage negligence and stimulate carelessness in the discharge of the carrier's duties to the passenger, then I must confess that I am ignorant of human nature, the general mode of transacting business, the motives and considerations which prompt the human family to action, and the powerful influence that self-interest plays in the affairs of man.

Many cases might be suggested where a certain mode of doing business might be very profitable to the master and extremely dangerous to the safety of the servant; and another mode less profitable to the master but reasonably safe for the servant. If under that state of facts the master should be properly indemnified against all damages which might be adjudged

against him on account of personal injuries sustained by the servant in consequence of the master conducting his business according to the dangerous mode, would there be room for serious argument as to which of the two modes the master would adopt? I think not, for the reason that self-interest would dominate the master and induce him to adopt the mode most profitable to himself, even though that mode should be more hazardous to the life and limb of the employee. But if upon the other hand the master was not so indemnified, the same spirit of self-interest would influence him in selecting the second mode or safer way, for the reason that while that mode might be less profitable than the first, yet the desire for the larger profit incident to the first would be more than counterbalanced by his fear to assume the responsibility of paying for injuries which the servant might probably receive, if the former plan was adopted. In other words, the evil incident to this class of insurance is not that it technically releases the carrier from his legal obligation to respond, in damages in payment for injuries inflicted upon his passenger in consequence of his carelessness in operating the train, but that by furnishing the carrier with a fund, by this mode of insurance, in which to reimburse himself for the money he was required to pay to the passenger in consequence of his negligence, then by the same act the pecuniary consideration and incentive which prompts and induces the carrier to exercise due care is removed and destroyed. The same is true in case of master and servant; and the due care the former owes the latter consists of affirmative action on his part—that is, he must be vigilant in observing the place where the servant works and the instrumentalities with which he performs that labor, and he must exercise due care in seeing said place and that those instruments are reasonably safe for him while in the performance of his duties to the master. The duty of the master to the servant is not satisfied

by furnishing in the first instance a reasonably safe
place in which to work and reasonably safe machinery
with which to labor, but that duty is a continuing
duty, and he is required by law to maintain that place
and those instruments in a reasonably safe condition.
The master must also employ servants who know and
understand the duty required of them, and that they
are sufficiently skilled in the business to properly dis-
charge the duties assigned them, and who will use due
caution to avoid injuring their fellow-servants.    If
the master has disregarded any of those duties and
as a result of that negligence a servant is injured,
then, under the law, he must respond in damages.    The
liability to thus pay that damage stimulates a desire in
the mind of the master to use reasonable care to avoid
so injuring the servant and spurs him to activity in
observing and inspecting the place where the servant
works and the machinery or other instrumentalities
with which he performs that labor.    By the exercise
of that diligence all defects in the machinery and all
dangers in and about the plant and machinery, if they
exist, to which the servant is exposed are discovered,
and the same incentive causes him to repair the de-
fective machinery and abate the dangers.

The damages the master is required to pay em-
ployees for injuries sustained by them in the course
of their employment constitute no small item in the
expense account in operating an industrial plant.    As
before stated, self-interest prompts the master to keep
the expenses of the business as low as possible.    In
fact that desire is the mother of and gave birth to
this class of insurance.    Now, if the desire to protect
that self-interest was sufficiently strong to stimulate
and spur the master on to action and do and perform
all of the things before mentioned, then when a fund
is provided for the master by an insurance policy of
the character in evidence with which to reimburse him-
self for those damages so paid, does it not have the

immediate effect of withdrawing the stimulant which incited him to action, and removing the consideration that spurred him on to vigilance and care in observing and inspecting the plant and machinery and paralyzing the hand that repaired the machinery and abate the dangers before mentioned? In answer to that question we must state that in our judgment it does.

Common knowledge and observation teach us that self-interest is the controlling influence and dominating power in all business pursuits. While ordinarily it would be unnecessary to try to prove that statement because it is a self-evident truth, yet it seems to have been denied by some of the best and strongest courts of this country, which is due, in my judgment, to a confused conception of the facts involved in cases of this character.

This statement is corroborated by the manner in which one of the largest businesses of this country has been conducted, which is well known to all well-informed men regarding business affairs. Some thirty or thirty-five years ago there was so much of that element of petroleum of which gasoline is made (and for which at that time there was but little demand) left in coal oil that a gas would be generated therein, and when lamps were lighted, for instance, frequent explosions would occur, which would often result very injuriously to persons and property all over the country. So frequently did that occur that stringent laws were enacted in almost all of the States of the Union, fixing the grades of oil and providing for an elaborate system of inspection in order to prevent the sale of oils of a higher degree of inflammability than that prescribed by the statute. But notwithstanding the law and the inspection, more of those properties of petroleum of which gasoline is made still found their way into coal oil, and the explosions of lamps and injuries incident thereto continued with little or no abatement until finally the gasoline stove, gasoline engine, gaso-

line boat, gasoline automobile, and many other consumers of gasoline consumed such large quantities of gasoline that the demand for it so increased that the price thereof was increased thereby and has been maintained in consequence thereof for several years above the price of coal oil. Since that time the duties of the coal oil inspector have become perfunctory, and no more coal oil is found which contains too much gasoline, and we no more read or hear of lamp explosions, except where gasoline is by mistake put in the lamp; and now the complaint is that gasoline contains too much coal oil, a reversal of the former state of affairs. I cite this instance to show that self-interest and the desire to make money out of a business is so strong that it will induce men to violate the law, evade the inspection and do that which results in great damage and destruction to life and property.

If self-interest will so dominate the conduct of men in the oil business and stimulate and incite them to violate the law which was so fraught with such injurious results to man and property, then why will not the same interest paralyze the hand of the man whose duty it is to make the repairs and abate dangers to the employee? The only rational answer that can be made to that question is in the affirmative.

It may be suggested that it is not the object of indemnity insurance to make money by collecting the policy. That is true, but the effect upon the interest of the insured is the same, for it is to prevent him from paying out his own means as a penalty imposed upon him for his negligence, or for the purpose of reimbursing him for money so paid by him.

The law is well settled, as before stated, that a contract entered into between the carrier and the passenger whereby the latter releases the former from liability for injuries sustained in consequence of the negligence of the carrier is void on account of its being in violation of public policy; and the reason as-

signed by all of the courts for that holding is, that if the carrier is released from the penalties imposed by the law for injuries done in consequence of his negligence, it will tend to encourage negligence on his part by removing the stimulant or consideration which prompts him to exercise reasonable care to avoid injury to the passenger. If that is true, then by parity of reasoning a policy of insurance which is to be collected and paid to the carrier for the purpose of reimbursing him for moneys which he was compelled to pay to a passenger as damages sustained in consequence of the former's negligence should also be held invalid, for the reason that by reimbursing the carrier you restore to him the damages paid the passenger, the same being the consideration and moving power which would have induced the exercise of due care had it not been for the policy.

It was suggested in oral argument that it would be startling to announce that indemnity insurance against damages in consequence of one's own negligence is illegal and not permissible in this State. As to that we are not in a position to concur or dissent, and it is wholly immaterial as to the proper disposition of this case, except in so far as public opinion regarding business matters generally reflects sound principles; but if upon careful investigation and after due consideration it is ascertained and determined that those principles are unsound and vicious in their consequences and injurious to the public safety, good health, peace and quietude of the community, then the courts of the country should not hesitate in pronouncing them illegal and void.

The very foundation upon which this class of insurance rests is built upon sand, and will not support the important structure which the business interests of the country are attempting to erect upon it. The very corner stone thereof, and all of its accompanying parts are essentially acts of negligence, necessar-

ily resulting in the death or the infliction of some personal injury upon the passenger, confessedly and invariably committed by the negligent act of the party who claims the right to make the contract and collect the indemnity provided for therein. In other words, in each and every instance where a policy of that character is issued it is applied for and taken out by the insured with the expectation and firm belief that the applicant is going to commit some inexcusable act of negligence which of necessity will result in the death of or in the infliction of some personal injury to some third person before the policy can be collected. [4 Current Law, p. 190; Finley v. U. S. Casualty Co., 83 S. W. 2.]

And if such policies of insurance are valid, then the insured must come into court and stultify himself by stating in his petition that he had disregarded the duties he owed to the public and to his passengers or employees, and as a result thereof he had negligently injured or killed him; that in consequence thereof he had been compelled by law to pay the damages sustained by such passenger or employee (who was no party to the contract of insurance) in consequence of the injuries so negligently inflicted. Should a court of justice uphold such a policy of insurance and assist the self-confessed wrongdoer, who has wrongfully killed or injured his fellowman, to collect the policy, and thereby enable him to escape the penalties incident to his own wrong? I think not, for it is axiomatic that courts will not assist a person to take advantage of his own wrong. [Burt v. Place, 6 Cowen 431.] The books are full of cases so holding, and they show it is wholly immaterial as to what is the character of the wrongful act, or the kind of garb in which it is clothed; but in such cases the sole question is, are the acts from which relief is prayed denounced as illegal or unlawful? and if answered in the affirmative then the doors of the courts of justice are properly

closed against the guilty parties, and the relief prayed is justly withheld.

' In my judgment a far stronger and a much more just argument can be made in favor of the validity of a contract entered into between the passenger and the carrier, or the master and servant, whereby the passenger or the servant for a valuable consideration releases the carrier or master from damages sustained by him on account of personal injuries received in consequence of the negligence of the carrier or master, for in that case the passenger or servant would be a party to the contract and would receive a consideration for the rights so released, and with full knowledge of the existence of the contract; and being conscious of the fact that the carrier or master owed him no duty, he would be better able and more liable to exercise a higher degree of care for his own safety than he would observe if he knew it was the duty of the carrier to exercise the highest degree of care known to the carrying world, and that the master would exercise reasonable care for his safety while in the discharge of his duties. Not only that but whatever rights he would surrender by such a contract would be the fruits of his own agreement. But no such argument can truthfully be made in favor of this so-called indemnity insurance. The passenger or the servant, as the case may be, is no party to the contract of insurance, he receives no consideration for the rights which are, indirectly, but which are just as effectually, taken from him as if he were a party to the contract, with the exception he does not waive his right to demand and receive compensation for those elements of the injury which can be paid for in dollars and cents, but the most serious and important elements of the injury are not susceptible of moneyed compensation, as was pointed out in a former part

of this opinion; and those elements of the injury which cannot be compensated for constitute the only reasons why the courts will not uphold the validity of a contract made by the passenger in favor of the carrier, whereby the latter is released from damages growing out of his negligent acts. The courts' reason for their refusal to uphold such contracts is that they violate public policy in that they encourage negligence which results in the loss of life and injury to the traveling public which cannot be paid for in dollars and cents. And for a similar reason contracts which relieve the carrier from damages caused by his negligence to goods shipped are held to be void. The owner or shipper of property is not the only person interested in its preservation. It is to the beneficial interest of the State and to all of the citizens thereof that useful and valuable things be preserved, for the reason that the useless destruction of property is offensive to the law of political economy.

If a thousand bushels of wheat are burned, not only does the owner suffer the loss of its value in dollars and cents, but the taxable wealth of the State has been diminished thereby to that extent without an equivalent in return, and the food supply of the State has been depleted to the same extent, which is a prime necessity, and its destruction has a tendency to advance the price of wheat and thereby increases the expenses of living. In the case supposed the loss to the State and the increase of the price of wheat might be small, but in principle it is the same as if a million or ten millions of bushels have been burned. It is for this reason that some of the States have enacted statutes making it a crime for any person to willfully destroy property of any kind.

But returning from this digression to the proposition under discussion. I think we have made it clear that the reasons given and the principles upon which those decisions rest which denounce as invalid all con-

tracts which release the carrier or the master from the consequences of his own negligence apply with stronger reason and with greater justice to indemnity insurance than to such contracts of release.

By consulting the labor reports of the United States and of the various States of the Union it will be seen that the number of personal injuries received by employees engaged in the industrial and mining institutions of this country is abnormally large as compared with those received by the employees engaged in like institutions in other countries, and there can be no question but what one of the principal causes of that deplorable condition is due and traceable directly to this class of insurance, which lessens the care which would otherwise be exercised by the masters toward their servants. I dare say that if the master was permitted, by law, to make a direct contract with the servant releasing him from all responsibility for injuries received in consequence of the former's negligence, the injurious effects thereof upon the employees would be no greater than this class of insurance has upon them.

Indemnity insurance, as understood in this class of litigation, is of comparatively recent origin, and there are but few cases involving its validity which have ever reached the courts of last resort. After a careful investigation I have been unable to find any policy of that character antedating the year 1886. The Phoenix case, supra, is based upon the Maryland and New Jersey cases cited therein, and after a careful consideration of them I am convinced that both of them are wrong upon principle and not supported by authority. And the News Company case, supra, is bottomed upon the Phoenix case, and for the same reason, in my judgment, it should no longer be followed.

In the Phoenix case the policy was to indemnify the carrier against damages done to goods and not

against injuries to persons, as is the case at bar. A contract regarding property might not be obnoxious to public policy, while a similar contract involving the safety of persons might be offensive to that rule, but a policy of insurance indemnifying the carrier of goods from loss caused by his own negligence is not involved in this case, and will not be decided for that reason. If the Phoenix case can be sustained at all upon principle it must be upon some principle which recognizes a distinction between indemnity insurance regarding property and that which relates to persons.

What has here been said regarding carrier and passenger applies equally well to master and servant. All the authorities so hold, including the cases of Phoenix Ins. Co. v. Railroad, supra, and Railroad v. Southern Ry. News Co., supra.

In the discussion of this proposition I have not overlooked the wise caution enjoined upon the courts by Mr. Justice BURROUGH, wherein he likened public policy to a bucking horse, in that it was dangerous when straddled and put in motion. That is true, and the greatest caution should be observed in the use and application of the rule of public policy, and should not be resorted to except in cases of extreme necessity, when no other remedy exists in the law, but when that necessity does exist it should be applied the same as any other law; and a court would be just as inexcusable for refusing to apply the rule to a proper case as would be the farmer who should discard all horses and refuse to use any of them simply because a few of them buck and thereby endanger the life and limb of the rider; but if properly bridled and saddled and ridden with due care, the danger of the rider is reduced to a minimum, and when so ridden the horse renders a valuable service to man. The same is true regarding the rule of public policy, when cautiously applied, in a case of necessity—it performs a wise and, useful purpose in the administration of the laws of

the State and should no more be repudiated in a proper
case than should the farmer discard the horse under
like circumstances. Both are dangerous, yet necessary,
and must be employed and used in proper cases re-
gardless of the danger, otherwise the fear of the rider
and the timidity of the court would work great injury
to society.

We, therefore, hold that the policy of insurance
mentioned in the pleading and evidence is absolutely
null and void and did not authorize respondent to
intercede and maintain the Big Circle Mining Company
in its defense to the action brought against it by ap-
pellant.

II. The second proposition presented by counsel
for appellant involves the validity of that provision
of the policy mentioned in the answer, which provides
that the respondent shall, at its own cost, undertake
the defense of such legal proceedings in the name of
and on behalf of the Big Circle Mining Company and
shall have the entire control of such defense.

It was under this provision of the policy of in-
demnity that respondent appeared in court and took
charge of and defended the suit of appellant against
said mining company—rather one of its claims is based
upon that clause. Appellant insists that said pro-
vision of the policy is void not only for the reasons
stated in paragraph one of this opinion but also for
the reason that it violates the law of maintenance.

In order to intelligently determine that conten-
tion it will be necessary to ascertain just what the law
of maintenance of this State is. I will quote from some
of the leading authorities bearing upon that question:

"Maintenance is an officious intermeddling in a
suit that no way belongs to one by assisting either
party with money, or otherwise, to prosecute or defend.
It is said to be an offense against good morals, in that
it keeps alive strife and perverts the remedial powers

of the law into an engine of oppression." [5 Am. and Eng. Ency. Law (2 Ed.), 815.]

Champerty is so closely allied to maintenance and possesses so many elements in common with it and they are so frequently considered and discussed together · that we can more readily and clearly understand the authorities if we briefly state the law of champerty in · this same connection.

Champerty is the species of which maintenance is the genus, and is defined by Blackstone as "a bargain with a plaintiff or defendant *campum partire* to divide the land or other matter sued for between them if they prevail at law, whereupon the champertor is to carry on the party's suit at his own expense."

"Lord Coke says: 'To maintain to have part of the land or anything out of the land, or part of the debt or other thing in plea or suit,' is champerty." [5 Am. and Eng. Ency. Law (2 Ed.), 816.]

The same authority on the same page classifies maintenance in the following manner: "Maintenance at early common law was divided into two classes: first, *ruralis,* or in the country, as where one assists another in his pretensions to certain lands, or stirs up quarrels or suits in the country, in relation to matters wherein he is no way concerned; second, *curialis,* or in a court of justice, as where one officiously intermeddles in a suit depending in any such court which no way belongs to him, by assisting either party with money, or otherwise, in the prosecution or defense of any such suit. The second class is still further divided into three subheads or species: first, where one maintains another in his suit without any contract to have part of the thing in suit, which generally goes under the common name of maintenance; second, where one maintains one side, to have part of the thing in suit, which is called champerty; third, embracery, as where one attempts to corrupt or influence

or instruct a jury, or any way to incline them to be more favorable to the one side or the other, by money, letters, promises, threats or persuasions, except only by the strength of evidence and the arguments of counsel in open court at the trial of the cause. So, also by laboring a juror to appear and act according to conscience or by indirect means, as where persons procure themselves or others to be sworn on a jury to serve the one side. [Brown v. Beauchamp, 5 T. B. Mon. (Ky.) 413, 17 Am. Dec. 81; 1 Hawk. P. C., 535, 552; Co. Litt., 368.]''

And on page 818 the same author distinguishes champerty from maintenance in the following words: ''Champerty differs from maintenance in this, that in the latter the person assisting a suitor is to receive no part of the benefits resulting from the action, while in the former he agrees to assist in the prosecution of the suit, and as a consideration therefor to share subsequently in the possible fruits or proceeds of the litigation. It therefore necessarily follows that if the offense in question does not amount to maintenance, there can be no champerty in it. The gist of the offense is the same in each, the difference being only in the mode of compensation.''

In Quigley v. Thompson, 53 Ind. 317, it is held that ''the distinction between maintenance and champerty seems to be this: Where there is no agreement to divide the thing in suit, the party intermeddling is guilty of maintenance only; but where he stipulates to receive part of the thing in suit he is guilty of champerty.'' See, also, Bell v. Smith, 7 D. & R. 846, 5 B. & C. 188, 11 E. C. L. 198; Scobey v. Ross, 13 Ind. 117; Wheeler v. Pounds, 24 Ala. 472; Arden v. Patterson, 5 Johns. Ch. (N. Y.) 44; Key v. Vattier, 1 Ohio 144.

And on the same page, section four, the origin of champerty and maintenance is stated in the following language: ''The doctrine of champerty and mainten-

ance, which prohibits contracts for part of the thing in demand, was adopted as an auxiliary regulation to enforce the general common-law principle which prohibited the transfer of all rights of action. The power of influential persons, to whom rights of action were transferred in order to obtain their support and favor in suits brought to assert those rights, was the cause of the rigid doctrine of the early common law. But as the rule of the common law, that rights of action cannot be assigned, has in modern times been reversed, the reason for the doctrine has in a large measure ceased to exist, and its early stringency has been greatly relaxed.''

With this brief statement of the law as to what maintenance and champerty are, the common and distinguishing features and the history of their origin, we will now turn our attention to the inquiry as to whether or not the law of champerty and maintenance exists in this State.

While that question has been presented several times in recent years to the courts of last resort of this State, yet it has not been an open question since the clear and able opinion in the case of Duke v. Harper, 66 Mo. 51, was written by HENRY, J., in the year 1877. In holding in that case that the law of champerty was in force in this State, the learned judge who wrote the opinion used this language: ''Section 1, page 886, 2d Volume Wagner's Statutes [which is the same as Sec. 4151, R. S. 1899] is as follows: 'The common law of England, and all statutes and acts of Parliament made prior to the fourth year of the reign of James I., and which are of a general nature, not local to that kingdom, which common law and statutes are not repugnant to or inconsistent with the Constitution of the United States, the Constitution of this State, or the statute laws in force for the time being, shall be the rule of action and decision in this State, any law, custom or usage to the contrary not-

withstanding.' Although we adopted the common law without the qualification that it be applicable to our condition, the courts would be at liberty to declare that any portion of the common law inapplicable to our condition and circumstances, does not obtain here. But there is nothing in the law of champerty as expounded by Blackstone and Bouvier, and the American courts in the adjudicated cases which we have cited, that is not applicable to our condition. The race of intermeddlers and busy-bodies is not extinct. It was never confined to Great Britain, and the little band of refugees who landed from the Mayflower on the coast of New England were not entirely free from the vice of intermeddling in the concerns of other people. It is as prevalent a vice in the United States as it ever was in England, and we do not see but that a law restraining intermeddlers from stirring up strife and litigation betwixt their neighbors is wholesome and necessary, even in Missouri. A man having a doubtful claim to property in the possession of another, who would hesitate to incur the expense of testing its validity, will readily agree that one who will bear the burden of the contest, and take part of the recovery for his pay, may institute the suit in his name. Such contracts are champertous and should be so held on principle everywhere.''

And in the case of Kelerher v. Henderson, 203 Mo. l. c. 515, this court, in discussing this question, said: ''Counsel for plaintiff next contends that the law of champerty does not exist in this State. We are unable to concur with the learned counsel upon that proposition,'' and cited in support thereof the case of Duke v. Harper, supra.

The same conclusions were reached by the Kansas City Court of Appeals in this case when it was before that court. [Breeden v. Insurance Co., 110 Mo. App. 312; Phelps v. Manecke, 119 Mo. App. 139.]

While all of the foregoing cases involved the law of champerty, yet champerty and maintenance in the main are one and the same, and inseparable, and where the law of the one exists there exists the law of the other also.

We, therefore, hold that the law of maintenance exists and is in force in this State.

III.   The next insistence of counsel for appellant is that an action to recover the damages which he states he sustained in consequence of respondent's intermeddling and defending his suit against the Big Circle Mining Company, which will hereafter be called the "Mining Company case," will lie against the respondent, said damages amounting to something over $4,600.

When this case was before the Court of Appeals, Breeden v. Insurance Co., supra, that court held that a civil action in this State would lie against a maintainer for the recovery of the damages the aggrieved party sustained in consequence of the unlawful interference of the former, but proceeded further and held that if it should develop on the trial that the respondent defended the suit of appellant against the Mining Company in pursuance to and by the authority of the provisions of the policy of insurance before mentioned, then he could not recover. The cause was remanded to the circuit court and a new trial was had in conformity to the mandate of the appellate court, which resulted in a judgment for defendant, and from which, as before stated, an appeal was taken to this court. By this appeal the correctness of the rulings of both the circuit court and of the Court of Appeals is challenged.

It must necessarily follow from the conclusions reached in the first paragraph of this opinion that we must hold those rulings were erroneous, for the reason that we there held that the entire policy of insurance

was violative of public policy, and was consequently absolutely null and void and constituted no authority for respondent's intermeddling in the suit in the Mining Company case.

But in addition to that, it is also contended by counsel for appellant that the provision of the policy which purported to give the respondent the exclusive right to settle or defend the suit of appellant against the Mining Company was also invalid because it offends against the law of maintenance.

The record discloses that the respondent had no interest whatever in the subject-matter of said litigation, nor was in any manner connected with any of the parties to that suit, except what interests and rights, if any, were conferred upon it by that provision of the policy.

The evidence also showed that had it not been for the action of respondent in maintaining the Mining Company, he could have recovered his judgment and could have collected the same from the latter before it became insolvent. Upon this state of the record is appellant entitled to a recovery in this case?

It is laid down as settled law that "a civil action for damages resulting from maintenance will lie at common law, and on the principle that when an unlawful act results in a particular wrong to a particular person the law, generally speaking, gives to such person a remedy by action against the wrongdoer, it seems that such an action can now be maintained in those jurisdictions where maintenance is unlawful." [5 Am. and Eng. Ency. Law (2 Ed.), 821.]

The law of maintenance as it existed in England prior to the fourth year of the reign of James I. was adopted as a law of this State by section 4151, Revised Statutes 1899. [Duke v. Harper, 66 Mo. 51.] That being true, it becomes necessary for us to ascertain what the law of maintenance in England was prior to that time.

In the case of Wallis v. Duke of Portland, 3 Ves. Ch. 1. c. 502, the Lord Chancellor, in discussing this question, said: "Maintenance by prosecuting suits, without distinguishing what suits, is punishable by an action by the party grieved also; and that is an action at common law. Statutes, prohibiting particular species of maintenance, add penalties; but it is laid down as a fundamental authority that maintenance is not *malum prohibitum,* but *malum in se;* that parties shall not by their countenance aid the prosecution of suits of any kind; which every person must bring upon his own bottom, and at his own expense. There is no case in contradiction to this."

And in the case of Pechell v. Watson, 8 M. & W. l. c. 699, 700, GURNEY, B., used this language: "Thirdly, the counts are good without concluding against the form of the statute, maintenance being an offense at common law, and the statutes on this subject being all merely declaratory of the common law, only enacting additional penalties."

This question came before the Queen's Bench in the case of Bradlaugh v. Newdegate, L. R. 11 Q. B. Div. 1-15. The opinion was written by the Lord Chief Justice COLERIDGE. Because of the great learning and research there displayed, the sound argument advanced, the wise and just conclusions reached, and the applicability of the principles there enunciated to the facts of the case at bar, I have been induced to quote the opinion in full, and at the same time it will contribute no little to the learning and wisdom of our jurisprudence, which is as follows:

"This action was heard before me on the 9th and the 17th of March in this year. The facts upon which the action was grounded, if the action would lie, were undisputed; the principle upon which the damages, if any, were to be calculated was in like manner agreed to. The jury were accordingly discharged. The facts and arguments in the case were proved and heard

before me alone, and I am now to deliver judgment. My judgment is, as I was informed, to be appealed from, and I was therefore inclined to send the respondent, whoever he might be, to the Court of Appeals unweighted by any reasons of mine. But, as the subject of the action is not common, and the authorities which deal with it are not familiar to every one, I have thought it best upon the whole to state not only my judgment but the grounds of it.

"The plaintiff and defendant are both members of the House of Commons, and the plaintiff had voted in the House of Commons and sat there during a debate after the Speaker had been chosen, without having made and subscribed the oath required by 29 and 30 Vict., c. 19, s. 5. The defendant appears to have been anxious to sue the plaintiff for the penalty of 500 lbs. which is imposed by the section I have quoted, and to which under the circumstances the plaintiff had become subject. He went at once to his own solicitor's office, in Gray's Inn Square, and what took place I will state in the words of that gentleman, who was examined as a witness before me. 'In June, 1880, I remember Mr. Newdegate coming to my office. It was late in the day. Before this day he had told me that he anticipated Mr. Bradlaugh would apply to take his oath and his seat; that, if he voted without taking the oath, he would be liable to the penalty; but that he was himself prevented by the forms of the House from bringing an action in his own name,' a complete mistake I may observe in passing, 'and therefore he must find some one who would bring it. On the day in June I speak of Mr. Newdegate came in a great hurry; he said Bradlaugh had taken his seat and voted, and that the writ must be sealed and served at once.' So far is the evidence of Mr. Stuart, the solicitor.

"Mr. Clarke, who was the plaintiff in the action which was brought against Mr. Bradlaugh for the penalty, was also called; and his evidence, so far as it is material to the present question, was as follows: 'I first heard of Bradlaugh having incurred the penalty sometime in June, 1880. I happened to be at Mr. Stuart's on business, and I heard of it in conversation with him. I believe it was on that occasion that I gave my consent to the issue of the writ in my name. I don't know who asked me, but I don't deny that I was asked. I may have given my consent without being asked, but I do not say I did. I knew a writ entailed costs. I quite appreciate the consequences of this action. I never could have pretended to pay the costs in this action. I had no means whatever to pay the costs. I gave Mr. Stuart no undertaking to pay the costs. I gave him no written instructions. I think there was no discussion as to the payment of costs between me and Mr. Stuart. I said I must be indemnified against the payment of costs. I don't know whether I said this at the first interview or later in the day; but it must have been just after I consented to let my name be used as plaintiff. I should not have brought the action without the indemnity. Mr. Stuart must have said he would get me one. He may have mentioned Mr. Newdegate's name. Very likely he did mention from whom he was going to get the indemnity. Mr. Stuart was then acting for Mr. Newdegate to my knowledge. In the result I got the bond which has been read in court this morning. But for that bond I should certainly not have allowed the action to go on.' So far Mr. Clarke.

"The bond was before me; it was dated the 14th of July, 1880; and so far as is material was as follows: It declared Mr. Newdegate to be 'held and firmly bound to the said Clarke in all sums of money, costs, charges, and expenses which the said Clarke has already paid or incurred, or is become liable to pay,

or shall hereafter pay, incur, or become liable to pay in and about the prosecution of the said action or in anywise relating thereto, and which the sum or sums of money (if any) which may be recovered by or ordered to be paid to the said Clarke in the said action, either in respect of the penalty sued for in the said action or for costs, shall be insufficient to discharge, and whether such sum or sums of money, costs, charges, and expenses which shall be so paid or incurred by the said Clarke shall be paid or incurred by him or in his behalf in the prosecution of the said action, or shall be ordered to be paid by him to the defendant in the said action or otherwise.' Such in its material substance is the bond.

"A fact must now be added which, when the case was heard before me, might perhaps have been anticipated but had not happened; the reversal by the House of Lords of the judgment given against Mr. Bradlaugh by the Court of Appeals in the case of Clarke v. Bradlaugh. The House of Lords dismissed Mr. Clarke's action with costs, on the ground that he, according to the words of the Lord Chancellor, 'has not any right to or interest in' the penalty he sued for. If he had not, it seems to follow that neither had Mr. Newdegate.

"The action now before me is brought by Mr. Bradlaugh against Mr. Newdegate because he (I omit the vituperative adverbs) upheld and maintained the action on the part of Mr. Clarke against the new plaintiff Mr. Bradlaugh. Two questions arise: (1) Will the action lie? (2) If it will, what in the present state of things are the damages?

"Mr. Newdegate was not called to deny or qualify the statements made by his own solicitor and by the person to whom he gave his bond of indemnity. It is proved that the action was in truth Mr. Newdegate's action; that Mr. Clarke was a man of straw, quite unable to pay costs, which in case of failure must be

heavy; that he never dreamed of paying costs; and that he never would have dreamed of bringing the action at all if Mr. Newdegate had not put him forward and indemnified him against all consequences of bringing it. Mr. Newdegate's bond is no doubt binding as between himself and Mr. Clarke, but it is only binding at Mr. Clarke's option, and if Mr. Clarke chooses to put it in suit. Mr. Bradlaugh's admission to the House of Commons, however, is a question in which a large number of persons have persuaded themselves that religion is involved; no one the least acquainted with human affairs but must have seen again and again the strange obliquities of which men, absolutely honorable in all other matters, will be guilty in what they think defense of what they think religion; and suppose Mr. Clarke, the man of straw, is content to become bankrupt and be ruined himself, while he half ruins Mr. Bradlaugh, what redress has Mr. Bradlaugh? He cannot himself sue on a bond to which he is no party, he cannot sue in Mr. Clarke's name nor compel Mr. Clarke to sue, for his benefit, in his own. It is probable, indeed, that by the agency of the court of bankruptcy this bond of Mr. Newdegate could be realized as an asset; and there are, I know, authorities which show that, under certain circumstances, this could be done. But it would be a remedy troublesome and expensive and after all not absolutely certain. How the facts may turn out in the result it is, I think, immaterial to inquire. The first question is, Will the action lie? and that must be determined by the legal relations existing between the legal liabilities *inter se* of the parties to it. There are many definitions of maintenance, all seeming to express the same idea. Blackstone calls it 'an officious intermeddling in a suit which no way belongs to one by maintaining or assisting either party with money or otherwise to prosecute or defend it.' [Bl. Comm., Book IV, c. 10, s. 12.] 'Maintenance,' says Lord Coke, 'sig-

nifieth in law a taking in hand, bearing up, or up-
holding of a quarrel, or side, to the disturbance or
hindrance of common right.' [Co. Litt., 368b.] These
definitions are repeated in substance in Bacon's
Abridgment, in Viner, and in Comyns, under the head
of maintenance.  To the same effect, though some-
what differing in words, is the language of Lord Coke
in the 2d Institute in his commentary on the Statute
of Westminster the First, c. XXVIII.  There is, per-
haps, the fullest and completest of all to be found in
Termes de la Ley: 'Maintenance is when any man
gives or delivers to another that is plaintiff or de-
fendant in any action any sum of money or other
thing to maintain his plea, or takes great pains for
him when he hath nothing therewith to do; then the
party grieved shall have a writ against him, called a
writ of maintenance.'  Chancellor Kent, adopting
Blackstone's definition, which definition itself is found-
ed on a passage in Hawkins, says that it is a princi-
ple common to the laws of all well-governed coun-
tries that no encouragement should be given to litiga-
tion by the introduction of parties to enforce those
rights which others are not disposed to  enforce.'
[Part VI, lect. 67.]  I quote from the excellent edition
of Kent's Commentaries, published by  Mr. O. W.
Holmes at Boston in 1873.  To the same effect is
another American authority, Mr. Story:  'Mainten-
ance is the officious assistance by money or other-
wise, proffered by a third person to either party to
a suit, in which he himself has no legal interest, to
enable them to prosecute or defend it.'  [Story on
Contract, ch. VII, sec. 578.]  Jacob's Law Dictionary
is to the same effect as the other authorities I have
quoted.

"I have been thus full in my citation of authori-
ties, because I conceive it to be important to keep

in view the original idea conveyed by the word in order to see whether modern authority has qualified or altered it, and to interpret the phraseology of modern decisions by principles which the judges who pronounced those decisions would undoubtedly have recognized. And it seems to me that, unless maintenance is to be struck out of digests and law dictionaries for the future, it is impossible to avoid the conclusion that Mr. Newdegate has been guilty of it. If this is to be done, it must be done by some higher authority. I have not the power, and, if I had, I have not the wish, to abolish an action which may be in some cases the only way of redressing very cruel wrongs. I do not in the least say that Mr. Newdegate deserves the stronger language in which Knight Bruce, L. J., describes what he calls 'breed-bates and barretors' and which will be found by any one, who desires to combine amusement with instruction, and to read good law in racy language, in the judgment in Reynell v. Sprye. But undoubtedly he drove on to sue Mr. Bradlaugh for a penalty, and he supported and maintained in involving Mr. Bradlaugh in protracted and expensive litigation, a man who admitted he would never have brought the action but for Mr. Newdegate, who would not have gone on with it but for Mr. Newdegate's bond, and who could himself pay no costs if he failed in his action.

''What is the state of the authorities on this subject? It is not useful to go very far back, because no doubt things were held to be maintenance some centuries ago which would not be held to be maintenance now. It may be that the danger of oppression of poor men by rich men, through the means of legal proceedings, was great and pressing; so that the judges of those days, wisely, according to the facts of those days, took strict views on the subject of maintenance. I do not pretend to the historical knowledge which would enable me to say with certainty whether

or no this was so; at least it is very possible. But the earliest case to which I think it useful to refer is that of Wallis v. Duke of Portland. That was decided by Lord Loughborough in 1797. He refused discovery to the plaintiff, on the express ground that, as it was sought to discover an agreement between the Duke of Portland and Mr. Tierney to join in the expenses of an election petition against the return of a Mr. Jackson, it was asking the Duke of Portland to discover what, if discovered, would be maintenance. The case was appealed to the House of Lords, and is to be found in the supplemental volume of Brown's Parliamentary Cases, p. 161. Lord Loughborough's decree was affirmed 'principally,' as the head-note states (in Brown the judgments do not appear at length) 'on the ground that the transaction amounted to maintenance at the common law.' Lord Loughborough and Lord Kenyon appear from the journals of the House of Lords to have been present in the House on this occasion. Lord Walsingham was also present; but I was in error on the argument in stating that he had been Chief Justice of the Common Pleas. Lord Chief Justice De Grey, the first Lord Walsingham, did not survive to 1798. For me, sitting at *nisi prius* and hearing a case on further consideration, this decision of Lord Loughborough affirmed in the House of Lords is a binding authority. In the Law Journal report, and in that only, of Findon v. Parker, to which I shall have presently to advert, Baron Rolfe, afterwards Lord Cranworth, is reported, and no doubt correctly reported, to have interjected the remark that the case of Wallis v. Duke of Portland had been disapproved of. He does not say where or by whom. If he means by himself, his authority, though not without weight, can hardly, I should suppose, be compared to Lord Loughborough's; and as he was speaking only of the case in Vesey, and seems to have been unaware of the subsequent affirmance of Lord Loughborough's

decree by the House of Lords, it is possible that, had he been aware of it, he would not have dismissed Lord LOUGHBOROUGH with such curt contempt. The interjected remark, I may observe, is not to be found in the report of the case in Meeson & Welsby. The cases of Sprye v. Porter and Stanley v. Jones were both of them instances of that head of maintenance which is called champerty, and are important chiefly as showing that neither the Court of Common Pleas in the time of TINDAL, C. J., nor the Queen's Bench in the time of Lord CAMPBELL, considered maintenance to be obsolete or exploded.

"The case of Pechell v. Watson is more directly in point. In that case a count, which had been proved in fact, and which charged against the defendants conduct really indistinguishable from the conduct here charged and proved against Mr. Newdegate, was held a good count for maintenance by the Court of Exchequer, consisting of PARKE, ALDERSON, GURNEY and ROLFE, BB. Pechell v. Watson came to be considered in Flight v. Leman. Its authority was recognized, but the latter case was decided against the plaintiff, who sued for maintenance, on the ground, I own I should have thought the narrow ground, that to instigate a suit was not maintenance, though to support one already instituted was. But the case of Flight v. Leman is not in point, because the bond, which is the gravamen of the present plaintiff's complaint, was not given till nearly a month after the issuing of the writ and the commencement of the action. I notice in passing the cases of Burke v. Greene where Lord MANNERS held that for one first cousin to advance to another sums of money for the recovery of an estate was, to use his words, 'a case of clear and distinct maintenance,' and of Harrington v. Long in which Sir JOHN LEACH, M. R., and Lord BROUGHAM, upon appeal, held that, while the mere assignment of the subject of a suit was not maintenance, yet that it was maintenance to agree

to give another the benefit of a suit on condition that he prosecutes it, and that it was properly discouraged because it promotes litigation and leads to oppression. These cases are both recognized in Hutley v. Hutley, which was indeed a case of champerty, but which is important as showing that in 1873 Lord BLACKBURN, LUSH, and ARCHIBALD, JJ., conceived the law of maintenance to be an existing law, and one which in a proper case they would enforce.

"It results, I conceive, from all these cases, and the number might be largely increased, that to bind one's self after the commencement of a suit to pay the expenses of another in that suit, more especially if that other be a person himself of no means, and the suit be one which he cannot bring, is still, as it always was, maintenance; and that for such maintenance an action will lie. It is said, however, that this general statement requires two qualifications; first, that the acts of the maintainer must be immoral, and that the maintainer must have been actuated by a bad motive; next, that if he has, or believes himself to have, a common interest with the plaintiff in the result of the suit, his acts, which would otherwise be maintenance, cease to be so. For the first of these propositions a passage in the judgment of Sir John COLERIDGE, delivering the opinion of the Judicial Committee in Fischer v. Kamala Naicker, is cited; and for the second the judgment in Findon v. Parker, and the judgments, especially that of ARCHIBALD, J., in Hutley v. Hutley. It is fit I should consider these authorities with the respect that is due to them and which I unfeignedly feel.

"If the judgment of the Privy Council had the sense which has been contended for, I, at least, am not prepared to say that I should hold the conduct or the motives of Mr. Newdegate, as proved before me (and I know nothing but what is proved), to be such as, within the words of that judgment, taken even

in the sense contended for, to relieve him from the character of a maintainer. But I am obliged to give a positive opinion on this point, because I do not think the words can fairly bear the sense ascribed to them. The words are remarkable. 'It [*i. e.*, maintenance] must be something against good policy and justice, something tending to promote unnecessary litigation, something that in a legal sense is immoral, and to the constitution of which a bad motive in the same sense is necessary.' The decision of the House of Lords shows, I think, that Mr. Newdegate's conduct was against good policy and justice, and tended to promote unnecessary litigation—but what is immoral in a legal sense? What in a legal sense is a bad motive? It is not perhaps quite easy to say. Yet the language I am quoting is not the language only of the Privy Councillor who delivered judgment, and who, by the course of the Judicial Committee, is by no means certainly the writer of it, but of Lord Kingsdown, of Knight Bruce, L. J., Turner, L. J., Sir Edward Ryan, Sir Lawrence Peel, and Sir James Colvile, a collection of perhaps as great lawyers as in the year 1860 could have been brought together, and who must have intended something by a form of words not usual, and clearly intended to be definite and exact. At least in any view it must mean as much as this, that to do what is illegal is legally immoral, and that a motive which impels to an illegal act is legally a bad motive. In this sense I do not hesitate to call Mr. Newdegate's conduct immoral and his motive bad. The language used is *obiter* only, for the judgment is in an Indian case, holding that the Sudder Adawlut could not decide a case upon the ground of champerty which the pleadings did not raise, but that, if they could, the champerty or maintenance by the English law, that is to say—and then follows the passage which I have quoted. *Obiter dictum*, however, or not, I entirely accept

it, and intend to decide this case in accordance with its language.

"This language was not, I think, intended to turn the court and the jury into doctors of casuistry, or to embark them in inquiries as to the true character in a court of morals of the conduct or the motive. If the thing done is injurious and unlawful, and if none of those excuses exist which have been held in law to justify the injury or render the act lawful, then the act is and remains unlawful and actionable; and further, as in the absence of evidence to the contrary, men are held to intend to do what they do in fact, if the act is one from which in the nature of things injury must follow, the doer will be considered to have intended the injury he has done, and the existence of the *mens rea* will be inferred, so far at least as the inference is necessary to the maintenance of the action.

"It is said, however, that the defendant had or believed that he had a common interest with Mr. Clarke in the result of the suit, and that, therefore, his finding Mr. Clarke the whole money for the litigation was not maintenance. As a general rule there is no doubt that such common interest, believed on reasonable grounds to exist, will make justifiable that which would otherwise be maintenance. The oldest authorities, authorities which hold a multitude of things to be maintenance which would not be held so now, all lay down this qualification. BROOKE, FITZHERBERT, ROLLE, HAWKINS, VINER, COMYNS, to cite no more, all concur in this. BULLER, J., in his celebrated judgment in Master v. Miller, strongly insists upon it. But then the instances they give show the sort of interest which is intended. A master for a servant, or a servant for a master; an heir; a brother; a son-in-law; a brother-in-law; a fellow commoner defending rights of common; a landlord defending his tenant in a suit for tithes; a rich man giving money to a poor man out of charity to maintain a right which he would otherwise lose. But

in all these cases the interest spoken of is an actual valuable interest in the result of the suit itself, either present, or contingent, or future, or the interest which consanguinity or affinity to the suitor give to the man who aids him, or the interest arising from the connection of the parties, *e.g.*, as master and servant, or that which charity and compassion give a man in behalf of a poor man who, but for the aid of his rich helper, could not assert his rights, or would be oppressed and overborne in his endeavor to maintain them.

"All this is recognized in the judgment of Lord LOUGHBOROUGH already referred to: and it is insisted upon with great force in the case of Findon v. Parker, a case which it is fit, from the reliance which has been placed upon it, that I should carefully examine. It was an action brought by an attorney for his bill of costs; it was brought against the person who had employed him to defend proceedings brought against himself and a number of other landowners, by Jesus College, Oxford, to enforce payment of titles, for lands, which it was asserted by the defendant and his codefendants were covered by a modus. The defendant pleaded that he, the defendant, had been guilty of maintenance in agreeing with other landowners to resist the claim of the college at their joint expense; and he insisted on his own wrong to escape the payment of his attorney's bill. No wonder that Lord ABINGER said, 'If any ground can fairly be suggested for making his contract legal, we ought to adopt it, in favor of the party who makes the defense, in order to acquit him of the imputation which he casts upon himself.' No wonder that Baron ROLFE said, 'The only hesitation I have had in this case has arisen from the fear, lest the indignation I feel against so unrighteous a defense as the present might lead one into bending the law more than ought to be done.' The judges show that there was abundant reason for the landowners to believe that they had a common ground for resisting,

and a common-interest in resisting, the claim of Jesus College; and they gave judgment for the plaintiff. In the course of Lord ABINGER's judgment occurs the well-known passage on which so much stress was laid, and properly laid, in the argument. It has been read so often that I confine myself to referring to it at page 682. It is full of the strong sense characteristic of Lord ABINGER, and I venture to adopt the language of Lord BLACKBURN in Hutley v. Hutley, and say that I incline to agree with and to adopt every word of it. But it has no application to the case before me; the interest in that case was an interest which the old law would have recognized, as Baron ROLFE expressly points out; and the case affords no ground for saying that the doctrine of maintenance in itself was either absolute or exploded. Indeed Lord ABINGER had expressly upheld it in Prosser v. Edmonds; and in Shackell v. Rusier, a case in many respects not unlike the present, the Court of Common Pleas refused to enforce a contract of the same sort as that between Mr. Clarke and Mr. Newdegate on the ground that it amounted to maintenance. See particularly the judgments of TINDAL, C. J. and BOSANQUET, J. What, then, is the common interest which existed here between Mr. Clarke and Mr. Newdegate? There is none, except the interest which all the Queen's subjects have in seeing that the law of the land is respected and the enactments of every act of Parliament are obeyed. The doctrine of maintenance is not confined to civil actions, and, if this be legal, it will be legal to agree to pay the expenses of any one who will indict another for the misdemeanor of non-compliance with any act of Parliament. The action here is brought for a penalty of five hundred pounds, imposed by an act passed in 1866 upon every member of the House of Peers and every member of the House of Commons, without distinction, who votes or sits during debate in either House without having made and subscribed the oath

thereby appointed. In the case of a member of the House of. Commons 'his seat shall be vacated as if he were dead.' In the case of a peer this consequence was, I presume, thought too severe, and it is omitted, and in this very Parliament certain peers who had not complied with the provisions of the statute were relieved from all danger of the penalties by acts of indemnity. As to a member of the House of Commons, however, his seat is vacated by the operation of the act, and the result of any action for the penalty can have no effect therefore upon the constitution of the House itself. The person contravening the act has ceased to be a member; the action is for a penalty; the result of the action is the recovery or failure to recover five hundred pounds; in that result it is not suggested that Mr. Newdegate had any interest, it was not argued that he was to share the penalty with the informer, and there is no other interest common to the informer and to him which is not common to him with every subject of the Queen. Indeed, if there had been a bargain, as certainly there was not, to share the penalty if recovered, it would have made the matter more illegal still. 'Do you, a man of straw, sue another for a penalty; I will find all the money, and if you recover the penalty we shall share it.' Such a transaction is not only maintenance, but champerty, and, though I need cite no authorities to show that it would be absolutely illegal, I will mention only the great authority of Lord ELDON, who in his judgment in Wood v. Downes, expressly so decides.

"It is true that this action is of the rarest; very few examples of it in any modern books are to be found. As a rule the doctrine and principles applicable to maintenance are discussed and laid down in judgments upon pleas, defenses to actions of the more ordinary kinds, in which the defendant has sought to set aside a contract, or to be relieved from an obliga-

tion, on the ground that the contract was void or illegal, or the obligation not binding, because founded upon what was, or what savoured of, maintenance. But I think it has been shown, not only from old abridgments and digests and text-writers, but by a chain of authorities from Lord LOUGHBOROUGH and Lord ELDON down to the present time, that the doctrine of maintenance is a living doctrine, and the action of maintenance is one which, in a fit case, the courts of this day will support. The action of Pechell v. Watson, to which reference has already been made, was such an action. It was an action brought expressly on the ground of maintenance, and the plaintiff recovered large damages. It was tried in 1841, and, as might be expected from the date, many points of pure pleading were raised and decided in it which have not now the importance they had then. But it was not even contended that the action was misconceived; or that if properly stated, and stated by the proper parties, such an action would not lie. The case is an express authority in favor of this kind of action. It is my fortune to have to support it in an action in which the defendant is a man whose character is entitled to great and true respect, and in favor of a plaintiff with whose opinions, openly enough avowed, I have no kind sympathy. Yet I will not call it ill fortune, for many of the most precious judgments which these courts have ever heard pronounced have been pronounced in favor of persons who, if English justice could ever be swayed by personal feeling, or could for a moment 'hedge aside from the direct forthright,' would assuredly have failed to command success. It is an ill-fortune perhaps that to many men, though not to me, the cause of true religion seems to be concerned with the legal success or the legal defeat of a particular person, whose legal success or legal defeat is really to the cause of true religion a matter of supreme indifference, yet in re-

gard to whom (I speak only of what has been proved before me) recourse has been had to proceedings which, with regard to any other accused person, would have been sternly and universally condemned, and of which unhappily in the minds of many men the cause of true religion is burdened with the discredit. My duty, however, is very simple; to decide the case according to the best opinion I can form of the law which I am sitting to dispense, a duty which the elements of Christian teaching make, if not pleasant, at least plain and clear.''

The Federal courts and a large majority of the State courts of this country have declared the law of maintenance to be in harmony with the rules laid down by the English courts.

In the case of Goodyear Dental Co. v. White, 10 Fed. Cas. page 752, the defendant was not interested in the defense of certain suits brought by the patentee against certain persons who had infringed upon his patent rights, furnished money and otherwise assisted in the defense of those cases. The part taken by Mr. White in the defense thereof greatly prolonged the litigation, which resulted in great damage and entailed upon the former large expenses and costs. After that litigation had been settled, the plaintiff therein sued White for maintaining the defense thereof, and asked judgment against him for the amount of the damages he had suffered in consequence of White's assistance and interference in the defense of those cases. In passing upon that case Mr. Justice BLATCHFORD held that at common law an action for maintenance would lie in that case, and that White was liable to the plaintiff for the damages he had sustained in consequence of his unlawful interference.

The same doctrine was announced in the case of Fletcher v. Ellis, 9 Fed. Cas. 266.

When this case was before the Kansas City Court of Appeals, Breeden v. Ins. Co., supra, in discussing the question now under consideration, ELLISON, J., in his usually clear and forceful language, said: ''Maintenance is one of the old actions at common law, the right of which exists to this day. [Bradlaugh v. Newdegate, L. R. 11 Q. B. Div. 1.] It is defined as an 'officious intermeddling in a suit that no way belongs to one, by assisting either party with money, or otherwise, to prosecute or defend.' And it is said 'to be an offense against good morals, in that it keeps alive strife and perverts the remedial powers of the law into an engine of oppression.' [5 Am. and Eng. Ency. Law (2 Ed.), 815.] The offense may be committed by stepping in after litigation has been begun, as by encouraging and aiding its origin. [Bradlaugh v. Newdegate, supra, 9.] Champerty is generally treated by text-writers in connection with maintenance and it, also, is one of the old common law actions which yet subsists. [Duke v. Harper, 66 Mo. 51.] These old actions, though akin, are unlike in many particulars. The champertor has in view a profit to himself in a share of the spoils of the litigation. The maintainer is more of a voluntary intermeddler and stirrer up of strife for the love of it. He is described as an officious intermeddler. In other words, he interferes where he has no business. This action being recognized to exist as a common law action, we have examined the petition with a view to ascertaining the legal merits of the demurrer. We find that it sets out the controversy which existed in litigation between this plaintiff and the mining company. That he obtained judgment against said company. That this defendant 'unlawfully, wilfully, and maliciously, without having any interest in the case, maintained the mining company by obtaining and prosecuting an appeal from the judgment,' etc. (describing how it did so). Continuing, it alleged that all

expenses of procuring and perfecting said appeal were paid by the defendant herein. The petition then alleges the reversal of the judgment and remanding of the cause for another trial. That at such second trial this defendant continued to maintain the defense at its own expense. That by various ways it caused the case to be continued and changes of venue to be had; but that finally, at the second trial, plaintiff obtained judgment against the mining company for $3,500. It then alleges that before the second trial the mining company had become insolvent, so that it became impossible for plaintiff to collect his judgment and that in view of such condition of the mining company he was compelled to accept $1,000 in full of his said judgment. That at the rendition of the first judgment the mining company was solvent and its insolvency came about between the first and second judgment. And that but for defendant's unlawful interference he would have collected the first judgment. And that but for defendant's continued unlawful interference and delay before the second trial he would have secured his second judgment in time to have collected it before the mining company became insolvent. In our opinion the petition stated a cause of action. If the acts are true (and we must so consider them) defendant was guilty of maintenance and should respond in damages.''

Such is the law not only of the States before mentioned, but it is the law also in the following States, namely: Alabama, Illinois, Indiana, Iowa, Kansas, Maine, Massachusetts, Nevada, New Hampshire, North Carolina, Ohio, Oregon, Rhode Island, Tennessee, Vermont, Virginia and West Virginia.

In New York the action has been abolished by statute, except in certain cases mentioned in the statute, while in Louisiana the whole subject is regulated by statute.

In Arkansas, Connecticut, Pennsylvania and Texas the subject has not been directly passed upon, but the rulings of the courts of Pennsylvania seem to be against the action; and in California, Delaware, Michigan, Nebraska and New Jersey it is held that the law of champerty and maintenance does not exist.

Much light is shed upon this question by some of the cases which hold that contracts of maintenance are void and will not be enforced by the courts.

In discussing the latter proposition the Court of Appeals of Kentucky, in the case of Lynn v. Moss, 62 S. W. 712, O'REAR, J., in an unusually able and clear opinion, in speaking for the court, said:

"This suit is brought by appellant upon an alleged contract with appellee, whereby appellant agreed and undertook to procure appellee's employment as an attorney at law to represent certain litigants in the contest of a will in McCraken Circuit Court. It is alleged in the petition: that the plaintiff, being an intimate acquaintance and friend of a poor widow and her two infant children, who were interested in an estate disposed of to others by a will of the children's deceased grandfather, undertook, at the request of appellee, to secure his employment as their attorney in contemplated proceedings contesting the will; that as a result appellee was employed under a contract to receive a sum equal to one-third of the estate recovered for his clients; that appellant was to render services in looking up witnesses, going errands, and being in general a factotum in connection with the working up of the case, including the furnishing of means to pay expenses of witnesses, etc. He alleges that he was to receive for these services, by agreement with appellee, one-half of appellee's fee; that as a result of the employment and of the services rendered by appellant the will was rejected by the jury and courts, and appellee's clients received some $18,000 in property, one-third of which has been con-

veyed to appellee; that appellee has paid appellant only about $1,025 of his half of his fee, and he sues for the balance. A demurrer was sustained to this petition. The amendment tendered averred that the pleader has misstated the plaintiff's cause of action in the original opinion; that in fact and in truth the arrangement was that appellant's good friends, the disinherited, being without means or prestige, and the adverse will having been set up by orders of the county court admitting it to probate, and the limitation for an appeal having nearly run, and a further fact making it necessary that prompt and decisive action be immediately taken by the disappointed members of the family, viz., the alleged fact that the estate was being rapidly and surely squandered in an *ex parte* dissipation of its assets, all being pressingly in mind, his friends aforesaid employed him to select and employ a lawyer, preferably appellee, and to assist that lawyer by aiding him in hunting out witnesses, going his errands, and defraying certain necessary expenses, for all which they agreed to pay him one-third, or a sum equal to one-third, of the estate recovered. He then alleges that, so armed with authority, he did employ appellee as the attorney, and agreed to give him one-half of the above compensation for his services; but that it was agreed between them that upon the recovery mentioned in the petition, for sake of appearance and facility in having the agreement executed through the court, the allowance was to be made in the name of the appellee, which was done; and that appellee, having collected the whole of the $6,000 fee, refused to divide with appellant further than to pay him about $1,025. He described the property received by appellee in payment of his fee, and sought to be decreed a lien thereon for $4,925, interest, and costs. The court sustained an objection to the filing of the amendment. Appellant declining to plead further, his petition was dismissed, and he

prosecutes this appeal, asserting the following grounds for a reversal of the judgment: (1) Appellee cannot withhold the money he received to appellant's use, even though the contract from which the money arose was illegal. (2) Champerty is the only form of maintenance which the statute forbids, and a contract to pay a sum equal to a certain proportion of the sum received is not within the statute. (3) A contract to assist another in a suit is not against the law denouncing acts of maintenance under the common law, it being argued for appellant that that branch of the law of maintenance has ceased to exist.

"It will be observed that appellant does not state that he had a license to practive law, and therefore we must assume that he did not have. Appellant, without pretense of relationship, or of original interest in the controversy, undertakes the prosecution of the appeal, and to furnish such evidence as he could learn of, for a stipulated consideration; in fact, every essential, for a part of the thing to be put in controversy by the suit. The act and contract clearly constituted what would have been maintenance, and perhaps champerty, at the common law. It is earnestly argued here for appellant, however, that the common law relating to maintenance, wherein it is not incorporated in our statute, has ceased to exist in Kentucky. We are cited opinions of some courts where it has been held that, owing to their long disuse, and the great change of conditions since the time when it was found necessary to apply the harsh doctrines of the law against maintenance, the acts then denounced are no longer illegal; and such is said to be the trend of the decisions in the States in modern times. Even were we inclined to follow sister jurisdictions in this departure, we must first find at least the same reasons they urge for doing so; for, not-

withstanding our statute on the subject of champerty and maintenance, and now in force (Sec. 209, Ky. St.) and which was first enacted in its present form about 1854, we have recently held that the ancient rule of common law against maintenance was yet in force in Kentucky, and so applied it. We refer to the case of Lucas v. Allen, 80 Ky. 681. There one Lucas, a layman, professing to have certain knowledge beneficial to the taxpayers of a city in a suit to recover taxes illegally collected of them, agreed to and did furnish certain attorneys information, and aided them in the prosecution of the suit, for which he claimed by contract one-half of their fee of some $18,000. Lucas was an employee of the city. We then held that his contract was void on two grounds: (1) 'It was against public policy, having an apparent tendency to corrupt, bias, tempt or draw away public officials from the honest discharge of their duties, and void, because in contravention of public policy.' (2) It was expressly held: 'This contract, in another respect, is illegal. It partakes of maintenance in its worst form. [Brown v. Beauchamp, 5 T. B. Mon. 413, 17 Am. Dec. 81.] Although the agreement was before suit was brought, yet the agreement was followed after its institution by the acts of Lucas in the upholding and assisting the Allens and their clients in the suit against the city.' The opinion in this case also furnishes the answer to the proposition that, notwithstanding the original contract was void, having been executed, appellee should not now be allowed to withhold appellant's part of it. The same argument was made in that case (Lucas v. Allen), and the same line of authorities relied on to sustain it. Said the court: 'And we cannot countenance the claim that it is an accomplished fact, and that, therefore, the proceeds of the illegal undertaking and maintenance of the suit ought to be divided.'

"It is further argued for appellant that he is shown by the averments of the amended petition to have contracted merely for his personal services in going errands, in locating witnesses, discovering evidence, and, as agent for contesting heirs, helping them to manage their business.  We do not decide that one may not employ a non-professional to assist him in doing what the litigant himself might properly do out of court concerning his litigation.  In Lutkenhoff v. Lutkenhoff (Ky.), 17 S. W. 863, such a contract was allowed.  But it should at least be an employment of the agent for his services, without making him personally interested in the result of the litigation. If the facts show that in reality the origin of the litigation is the result of the agent's interference and intermeddling; that his 'agency' is but another and milder name for 'champertor;' that he is, if successful in his enterprise, to receive a part of the thing in litigation, and nothing if not successful—the arrangement bears every objectionable feature of simple maintenance, is contrary to public policy, and has been constantly denounced in this State as illegal. True, here the agent claims to have contracted 'for a sum equal to one-third of that recovered,' and in this way he seeks to avoid the effect of the real transaction.  This we regard as an evasion of the spirit and intent of the statute.  If the facts show—as we think they do in this case—the elements of maintenance or champerty, the form of contract adopted by the champertor to defeat the effect of the law should be and will be disregarded, the substance and intent of the contract being allowed to prevail over its form. In Lyon v. Hussey, 82 Hun 15, 31 N. Y. Supp. 281, the court, in holding a contract to furnish evidence to establish the claim of one of the parties to an action about to be commenced against public policy, and not enforceable, said:  'The mere statement of the proposition seems to show that such contract could never

be recognized in a court of justice.' Whether the attorney actually engaged in such an enterprise as is stated in the petition, from the nature of this case the record cannot disclose."

In the case of Burt v. Place, 6 Cowen 431, it appeared that the plaintiff had conveyed a tract of land to the defendant by deed acknowledging the receipt of $300 as the consideration. But in fact only $10 were paid. The defendant agreed to pay the residue in specific articles, excepting $50 which he was to retain for assisting the plaintiff in defending a law suit before a justice of the peace. The defendant afterwards sold the land to Addington, by deed acknowledging the receipt of $250, as the consideration. He assisted the plaintiff in defending the suit, but was not a licensed attorney or counselor. In passing upon that case the court, through SAVAGE, C. J., said:

"Several objections to the plaintiff's recovery were taken at the trial; but the only one passed upon by this court, was, that the transaction was illegal; that the plaintiff's claim for either the value of the land, or the money which the defendant had received for it, was founded on an illegal agreement between the parties; a part of the consideration being for maintenance. That this vitiated the whole transaction; and the parties being *in pari delicto,* the plaintiff could not recover.

"The main question then is, can money paid or received upon an illegal contract be recovered back?

"The general rule of law is, that it cannot, when it is paid upon an illegal consideration, and both parties are equally criminal. This was so laid down by Lord MANSFIELD, in Smith v. Bromley (Doug. 696, note). His language is, 'If the act is, of itself, immoral, or a violation of the general laws of public policy, there, the party paying shall not have his action; for where both parties are equally criminal against such general laws, the rule is, *potior est con-*

*ditio defendentis.*' In Lowry v. Bourdieu (Doug. 467) he said, he desired it might be understood, that the court held, that, in all cases where money has been paid on an illegal consideration, it cannot be recovered back; except in cases of oppression, where the parties are not *in pari delicto.* In Howson v. Hancock (8 T. R. 575), Lord KENYON says, 'There is no case to be found, where, when money has been actually paid by one of two parties to the other, upon an illegal contract, both being *particeps criminis,* an action has been maintained to recover it back.'' This doctrine has been since repeatedly recognized; and I know of no case containing a contrary doctrine. In Lowry v. Bourdieu, BULLER, J., says, 'There is a sound distinction between contracts executed and executory; and if an action be brought with a view to rescind a contract, you must do it while the contract continues executory; and then it can only be done on the terms of restoring the other party to his original situation.'

"In Hunt v. Knickerbacker, 5 Johns. 334, THOMPSON, J., says, 'It is a general rule of law, that all contracts or agreements which have for their object anything which is repugnant to the general policy of the common law, or contrary to the provisions of any statute, are void, and not to be enforced.'

"The contract was both *malum in se,* and prohibited by statute; and, although it is against conscience for the defendant to keep the plaintiff's money, the court will not lend its aid to enable the latter to recover back money thus illegally paid.''

In Underwood v. Riley, 19 Wis. 412, Riley executed note and mortgage to Underwood for $1,370. Subsequently thereto one Merrick instituted a suit against Underwood to foreclose a mortgage theretofore executed by him to said Merrick; and at the same time there was an action brought by Merrick against Riley to foreclose the mortgage made by Riley to

Underwood, which had been assigned to Merrick as collateral security for Underwood's debt to him. During the pendency of those two suits Riley and Underwood entered into an agreement by which the latter agreed to receive from the former $600 in full satisfaction of the first mortgage, on condition that Riley should defend the action of Merrick against Underwood, and save the latter harmless from all costs, charges, fees, judgments and damages that might accrue therein. Riley failed to save Underwood harmless according to the terms of the contract, and the latter sued the former for damages for a breach of the contract. Riley was not a lawyer and had no interest in the subject-matter or result of the suit, except that mentioned in the contract. In passing upon that case COLE, J., on page 416, said: "There are several difficulties with the appellant's defense. In the first place we think it very clear that the agreement relied on in the answer was tainted with maintenance and champerty, and was consequently void."

In the case of Phelps v. Manecke, 119 Mo. App. 139, defendant owned a saloon, and one Weller a farm. Manecke traded the saloon to Weller for the farm. Afterwards the latter claimed fraud on the part of the former, and was threatening to have Manecke arrested for violating the United States revenue laws. After stirring up the trouble between Manecke and Weller, Phelps undertook to quiet Weller and thereby save Manecke from criminal prosecution. In consideration of that kindly office, Manecke agreed to pay Phelps the sum of $600, three hundred of which he paid in cash, and executed to Phillips the note sued on for like sum. When the note matured Manecke refused to pay it, and Phillips brought suit against him on the note. The defendant answered by alleging, in substance, the facts above stated, and insisted that the contract out of which the note grew impinged the law of maintenance and was therefore void. In pass-

ing upon that question ELLISON, J., said: ''Plaintiff was an outside party wholly without interest in the matters out of which a legal controversy might arise between Weller and defendant, and, according to his own statement, he was to take up Weller's cause, employ lawyers and get up evidence at his own expense. His engagement, the abandonment of which he relies upon for consideration to support the note, was clearly and plainly what the law calls maintenance, and was therefore unlawful. [Duke v. Harper, 66 Mo. 51; Gilbert v. Holmes, 64 Ill. 548; McGoon v. Ankeny, 11 Ill. 558, 560.] We considered such questions in a recent case in this court, pronouncing acts of maintenance to be unlawful in this State. [Breeden. v. Ins. Co., 110 Mo. App. 312.] The abandonment of an unlawful enterprise, though it would have been profitable, is not a valid consideration. It is against public policy to permit one to demand a price for abstaining from an unlawful project or an evil deed. In such case there can be no consideration; for the wrongdoer has not lost anything which he had any right to gain.''

Innumerable cases of like import might be cited and discussed, but those before considered are sufficient to clearly disclose the object and policy of the law, and its application to the case at bar. In the light of those cases we will turn our attention to the facts of this case and determine whether or not the policy of insurance issued by respondent to the Big Circle Mining Company was a valid authority for it to appear and defend the mining company case. The respondent maintains the affirmative, and the appellant contends for the negative of that proposition. These positions of the respective parties sharply present the legal proposition involved on this branch of this long drawn out litigation, which originated some nine years ago, and the end thereof is not yet reached.

It is insisted by counsel for respondent that it was not an intermeddler in the mining company case, for the reason that the policy of insurance issued by it to said mining company gave it an interest in and the authority to defend that suit. In our opinion that contention is untenable for three reasons:

1st. Because the policy of insurance was absolutely null and void for being in violation of public policy, as was shown in paragraph one of this opinion.

2d. Even though it be conceded that the policy of insurance is valid in so far as the indemnity clause is concerned and could be enforced and collected by the mining company, still that would not have authorized the respondent to intermeddle and defend the mining company case, on the grounds of subrogation, for the obvious reason that the mining company had no rights against appellant to which the respondent could be subrogated, or *vice versa,* since the record discloses the appellant was no party to the policy of insurance, and could in no sense become a beneficiary under it. In so far as the policy of insurance is concerned, appellant is a total stranger to both the respondent and the mining company. There is no privity of contract, estate, or of blood existing between him and them, and said policy is just as foreign to the issues which were involved in the mining company case as would be a promissory note held by the mining company against the insurance company.

Therefore, in the name of reason and common sense, I ask upon what ground can it be contended that the respective rights and obligations of the respondent and the mining company existing under said policy of insurance can or should be injected into and adjudicated in this suit?

There is no issue that could possibly arise which effects plaintiff's rights, or which he could litigate

or settle in that case. Why then should he be required to stand like a dummy for years, in so far as that feature of the case is concerned, and be compelled to suffer the parties to the policy to litigate their rights and obligations arising thereunder? And be required to run the risk of the mining company becoming insolvent in the mean time, as it did in this case. In the name of right reasoning and simple justice, I submit that there is no justification for the perpetration of such an outrage upon him.

The only answer that counsel has attempted to make in justification is found in the opinions of courts which held that a surety or guarantor on a note may aid the principal in his defense when sued on the note; and that a warrantor of title to real property may aid and assist the warrantee in his defense of a suit brought questioning his right or title to the real estate. Those cases involve an entirely different proposition and do not rest upon the principle contended for here. In such cases the surety and guarantor are parties to the note, and, of course, are proper parties to a suit which seeks to hold them liable on their contract of guaranty or suretyship; and in the case of a warrantor of the title to real estate, his warranty deed constitutes one of the links in the chain of title to that real estate, and his covenant of warranty to defend runs with the land, and it is perfectly proper to make him a party to any suit assailing the validity of the title he conveyed, and which he is bound to defend under his covenant to warranty. In other words, the surety and guarantor are parties to that note, and when their contract is involved in a suit they are proper parties; and in the case of a warrantor, his deed constitutes a link in the chain of title, and when his warranty, which runs with the land, is questioned, then he is a proper party to any suit which involves the title to the land or his covenant of warranty which runs with it. To outline generally

without attempting to go accurately into the details of the law or facts involved in a suit against a guarantor, it will be sufficient to state that he has either signed the note sued on, or has signed some other writing by which he obligated himself to pay the same, in case the maker fails to do so, etc. In each case the payee accepts the note, together with the accompanying contract of guaranty, and by so doing he knew of and by implied contract he agreed that the rights and interests of all the respective parties thereto might be settled and adjudicated in the same suit according to the law. And in the absence of an agreement to the contrary, the contract of the guarantor follows the note and inures to the benefit of all subsequent holders thereof, and each of them by accepting the note acquired all the rights of his indorser and by implication assumed all the duties and obligations which rested upon indorsers by virtue of said contract and the various contracts of indorsement.

But no such contract exists in the case at bar. Appellant is a perfect stranger to the policy of insurance, set out in the answer; nor has he agreed by express contract, nor does his contract of employment include an implied agreement with the employer and the insurance company to the effect that the latter may intermeddle and defend a suit he may bring against the master for damages sustained in consequence of the master's negligence. What has been said regarding a guarantor and guarantee is also true as to the principal and surety, maker, indorser and indorsee and all other parties to that class of contracts.

In discussing the question as to the right of a holder or indorser Chief Justice MARSHALL of the Supreme Court of the United States, in the case of Riddle v. Mandeville, 5 Cranch l. c. 331, used the following language: ''This subject may and ought to be contemplated in still another point of view. It has

been repeatedly observed that the action against the indorser is not given by statute. The contract on which the suit is maintained is not expressed, but is implied from the indorsement itself, unexplained and unaccompanied by any additional testimony. Such a contract must, of necessity, conform to the general understanding of the transaction. General opinion certainly attaches credit to a note, the maker of which is doubtful, in proportion to the credit of the indorsers, and two or more good indorsers are deemed superior to one. But if the last indorser alone can be made responsible to the holder, then the preceding names are of no importance, and would add nothing to the credit of the note. But this general opinion is founded on the general understanding of the nature of the contract. The indorser is understood to pass to the indorsee every right founded on the note which he himself possesses. Among these is his right against the prior indorser. This right is founded on an implied contract, which is not, by law, assignable. Yet if it is capable of being transferred in equity, it vests, as an equitable interest, in the holder of the note. No reason is perceived why such an interest should not, as well as an interest in any other chose in action, be transferable in equity. And if it be so transferable, equity will of course afford a remedy. The defendant sustains no injury, for he may defend himself in equity against the holder as effectually as he could defend himself against his immediate assignee in a suit at law." Under the law of this State it is not necessary for the holder of a note to resort to a court of equity in order to reach an indorsee thereon, as was required by the laws of Virginia, when the above case was decided, but that fact does not alter the rule under discussion.

And continuing further the same distinguished jurist said: "The case put, of the sale and delivery of a personal thing, is not thought to be analogous to

this. The purchaser of a personal thing does not, at the time of the contract, look beyond the vendor. He does not trace the title. It passes by delivery. But suppose the vendor held it by a bill of sale containing a warranty of title, and should assign that bill to his vendee; is it clear that, on loss of the property for defect of title, no recourse could be had to the warrantor of that title? The court is not prepared to answer this question in the affirmative." To the same effect are the cases of Allen v. Kennedy, 91 Mo. 324, and Johnson v. Johnson, 170 Mo. l. c. 49.

Since the rendition of the opinion just mentioned, the courts of practically all of the States of the Union have followed it, and have enunciated the law as therein stated. Out of this rule grew the corresponding right of the indorsee upon a note, when sued thereon by the holder, to notify and bring in as a defendant any and all previous indorsers not sued by the holder to defend the suit brought. The object and purpose of this rule is to prevent multiplicity of suits when the rights of all of the parties to the note can be settled in one case. But this rule did not authorize the mining company to notify the respondent to come in and defend the mining company case, for the obvious reason that the latter was no party to the contract of employment which existed between appellant and the mining company.

And as before stated, in the case of a warrantor of title to real estate, his warranty deed constitutes a link in the chain of title to that property, and by the law, in the absence of an agreement to the contrary, his covenant of warranty runs with the land and inures to the benefit of all who acquire title to the property through that chain of title. When a grantor of real estate conveys it by such a deed he understands the legal effect thereof, and by his express contract must defend the title of his grantee and those claiming under him; and by implication and

by virtue of the covenant running with the land, he may be required to defend the title in the hands of all subsequent purchasers who deraign title through him. So when notified to come in and defend, he responds in pursuance to the terms of his deed, and assists in the defense of the suit which is brought to test the validity of that title, and he does not thereby occupy an independent and hostile position toward the title which he had conveyed and covenanted to defend. So, in such case it is wholly immaterial whether one claims under that title or independent of it if he institutes suit for the purpose of questioning its validity, he, by the same act, assails the title as he finds it; and if the entire chain of title is questioned, then by that act he puts in issue every deed of conveyance composing that chain of title; but if he challenges only certain links thereof, then he puts in issue only such deeds as constitute those particular links; and in either case the party or parties whose deed is thereby put in issue and the validity of which is thereby questioned, he is, or they are, thereby made proper party or parties, and upon notice must appear and defend his or their deed or deeds, according to the terms of the covenants contained therein. By thus assailing the validity of any deed, the plaintiff, whoever he may be, thereby presents an issue for adjudication which makes it proper for defendant in the suit to call in his warrantor to defend the title conveyed to him by the deed which is assailed. [Allen v. Kennedy, 91 Mo. l. c. 329.] In all three of the cases mentioned the surety, guarantor and warrantor were proper parties, under the contract, and in certain cases the warrantor might become a proper party by virtue of his covenant of warranty running with the land.

In oral argument kindred cases to those just considered were mentioned as supporting respondent's position, but if critically analyzed it will be seen that

they are not in point and do not support the proposi-
tions contended for.  In the mining company case there
was no privity of contract, estate or blood existing
between the plaintiff therein and the mining company,
whereas in the cases of surety, guarantor and war-
rantor there was privity of contract existing between
the plaintiff and the guarantor or surety who was
called in by the defendant to assist in the trial of the
case; and in the case of the warrantor, there was either
privity of contract existing between him and the plain-
tiff, or else the plaintiff was assailing the validity of
the covenant of warranty which ran with the land.  In
either case plaintiff put in issue the validity of the
deed or that covenant which gave those claiming un-
der it the right to call the grantor in and defend the
suit according to the terms of his covenant.  By assail-
ing the deed or the title with which the covenant ran,
the plaintiff made the grantor a proper and in some
cases a necessary party to the suit.  [Gaylords v.
Kelshaw, 68 U. S. 81.]  From these observations, which
are academic, it is seen that the cases mentioned do not
support respondent's contention.

3d.  The third reason why respondent's position
is not tenable is that the stipulation contained in the
policy of insurance which purports to give respondent
the right to defend the mining company case, which
was brought by appellant against the mining com-
pany to recover damages for personal injuries re-
ceived in consequence of its negligence and upon which
respondent bases his last contention in support of
his defense, is absolutely null and void: first, because
appellant was no party to the said stipulation, and,
consequently, the insured, the mining company, had
no authority by contract or otherwise to authorize
the respondent to appear and defend the mining com-
pany case in the name of that company, as is provided
for in the policy.  There is no law which authorizes

the making of a contract whereby the defendant in a case can escape the responsibility of defending it and delegate that duty upon another as was attempted to be done in this case. The proper parties to a suit and the persons upon whom the duty devolves to defend the same are not fixed and determined by a collateral contract entered into by the defendant and some third party, but those matters must be determined by the issues presented by the pleadings and no one is a necessary or proper party thereto, or has the right to prosecute or defend the same without those issues involve his rights or interests. If that could be done, then a defendant in a suit has it in his power by contract to virtually substitute for himself some third party as defendant, or at least, to add a second defendant, without the consent of the plaintiff, and that too when there is no possible issue that can be litigated in the case in so far as the third party is concerned. It would not be contended for one moment that the defendant in a cause could make a valid contract of the kind stated in the policy with a licensed attorney at law. If not valid when made with a lawyer, then what hidden elixir of life gives it vitality and force when made with an insurance company? The second reason why that proposition of the policy is void is because it plainly violates both the letter and spirit of the law preventing maintenance.

The vice of champerty and maintenance consists in the unlawful stirring up and prosecuting or defending litigation by an intermeddler in which he has no interest. Such unlawful practice is detrimental to the peace, good order and well-being of the community, in that it stirs up strife and litigation between neighbors, and arrays the rich and the strong against the poor and the weak, and interferes with the speedy settlement of disputes and litigation, and results in injustice and oppression to the poor and helpless. All of the authorities agree that the two chief elements

constituting the offense of champerty and maintenance are, first, that it stirs up strife between neighbors; and, second, that it results in injustice and oppression to the weak. [Duke v. Harper, 66 Mo. 60, 61; Bradlaugh v. Newdegate, L. R. 11 Q. B. Div. l. c. 7, 13.]

Judging from the pleading and evidence in the case at bar, the respondent was organized and incorporated as an insurance company for the express purpose of issuing, for a valuable consideration, insurance policies insuring employers against damages for injuries done to their employees, caused by the negligence of the former. It has no interests in the business of the master or servant, nor in the subject-matter of the suit brought by the latter to recover of the former damages sustained in consequence of the master's negligence. This contract attempts to divest the master of all right to compromise and settle claims and disputes which the servant may have against him growing out of personal injuries, and transfers that exclusive right to the insurance company. The master under that contract retains no authority to settle even the smallest claim the servant may have against him however just it may be, but the policy arbitrarily requires the master to give immediate notice of the claim to the insurance company.

The business force of the insurance company is well organized. As a rule it has a corps of able lawyers and skilled adjusters, some of whom are located in the chief industrial centers of the country; and when an injury occurs the insured is required to report the case to an agent named in the policy, who immediately upon receipt of the notice dispatches a trained adjuster to the scene of the injury, who makes an investigation of the same, takes the names and addresses of the witnesses and a statement from each, if they will give it, as to how the injury occurred. The result of that investigation, together with the

statements of the witnesses, are sent to the person who has charge of the business of the company. The adjuster under the advice of counsel then approaches the injured person, or some representative, and undertakes an adjustment of the claim. If not settled upon his terms, the matter is dropped and nothing further done, without the injured party brings suit against the master. When the day of trial arrives the insurance company appears in court with its able counsel and trained adjusters, takes charge of the case and defends same, many times without the presence of the master, and seldom even with his presence if he does not happen to be a witness in the case. If the trial does not result favorably to the insurance company it makes the affidavit for an appeal to the effect that the master is aggrieved, etc., by the judgment, and follows the case through the appellate courts and back to the circuit court, in case the judgment is reversed, and so on until a final judgment is reached or a settlement is made.

The unlimited means at the command of the insurance company, its able lawyers and skilled agents enable it to carry on this class of litigation without distress to itself, but which is very burdensome and oppressive to the injured, which often leads to unjust settlements or in a miscarriage of justice. Whereas, if upon the other hand the master had retained the control of his own case, the probabilities are that the great majority of the cases would have been settled amicably and with speedy justice to all concerned. But the plan of the insurance company stirs up strife and litigation among neighbors, and arrays itself against the injured, the weak and the poor, which leads to neighborhood disturbances, strife and ill-will, and to injustice and oppression of the weak by the strong. Organization and capital are just as insidious

and potential to-day in the prosecution and defense of a law suit as they have been in any period of time.

The respondent in this case wrongfully, unjustly, and maliciously and unlawfully instigated, upheld and maintained said action on the part of the mining company against the appellant, by reason whereof the latter was greatly injured, prejudiced and aggrieved in and about the prosecution of his case, and was compelled to incur and pay divers sums of money in the prosecution of his said action. In short, respondent was an officious intermeddler in that case, and, in consideration of the sum of $85 paid to it by the mining company, it defended and maintained this long drawn out suit; and in consequence of that wrong, appellant will not be able to collect his judgment recovered against the mining company, while had it not been for that intermeddling he would have done so.

The fact that the respondent was incorporated for the express purpose of prosecuting or defending suits on the wholesale order does not entitle it to a more favorable consideration in a court of justice than if it was doing so on a smaller scale, as was done by the maintainers named in the cases before cited. In fact, it does not stand so fair as they, for one of the chief objects of the law of maintenance was to discourage litigation, and the other was to abolish the evil of the strong oppressing the weak, and thereby put a stop to the wholesale, unjust, malicious and vexatious litigation. Such unequal legal contests, with their attending powers of oppression and injustice, gave birth to the law of champerty and maintenance, and the courts should not hesitate to enforce the law when the law itself is used as an engine of oppression. This fact is emphasized by the solicitude the law entertained for the poor and the weak in the trial of law suits. It will permit the indigent to sue as a poor person, and will permit men

of talent and means to assist a charity litigant in
the prosecution or defense of a suit. In such cases
men of means, even under the most stringent forms of
the law of maintenance, might freely contribute to the
prosecution or defense of their case. This formed
one of the well known exceptions to the law of champ-
erty and maintenance, and was allowed for the express
purpose of preventing oppression. Such has been the
law for centuries, and if the same assistance had been
furnished to one not in stringent circumstances, he
would have thereby subjected himself to both criminal
and civil prosecutions.

The following quotation from the case of Harris
v. Brisco, L. R. 17 Q. B. Div. 1. c. 513, will show the an-
tiquity of this law: "It is, no doubt, remarkable that
no case can be found in our law books in which the de-
fense of charity has been actually raised to a pro-
ceeding of maintenance. But the proposition, that
charity is a good defense, was asserted by the judges
as well known and understood law more than four
hundred years ago, when the law of maintenance was
more familiar than it is now, and it has been adopted
and accepted by the compilers of the digests to which
we are accustomed to look for guidance, and upon this
proposition no judge, counsel, or writer has, so far as
we can learn, thrown any doubt. We hold that the
proposition is part of the law of England."

There is no difference in principle between this
case and the land case, or the note cases decided in
the case before cited. In each of them the maintainer
had no interest whatever in the suit which he was
prosecuting or defending, and who was prosecuting or
defending solely on account of the contract he had
with the real party in interest, and that is precisely
the same relation and status the respondent in this
case bore to the mining company in the mining compa-
ny case.

The practice of champerty and maintenance of to-day, under one guise or another, has never had a parallel in the history of jurisprudence. One of the most dangerous forms of it to society is the class we are now considering; and another one of which is no better and equally injurious is that form of maintenance practiced by, that class of lawyers called "snitches," that is, where the lawyer looks up a party who has a real or an imaginary cause of action but who has no intention of bringing suit thereon, but by argument and persuasion, or other influence, the lawyer induces him or her to institute suit thereon, and agrees to pay him a certain percentage of the amount recovered, for legal services rendered in prosecuting the suit. If both of these forms of champerty and maintenance could be abolished, it would add much to the dignity and orderly administration of the law and materially aid in the elevation of the legal profession to the high plane it occupied prior to the time it was invaded by the spirit of commercialism.

We are, therefore, of the opinion that the policy of insurance is void, not only for the reason that it is in violation of the public policy, but we are also of the opinion that the provision thereof which purported to divest the mining company of its right and authority to defend the mining company case and attempted to confer that right and authority upon the insurance company is also null and void, because it does violence to the law of maintenance.

IV. The respondent finally insists that the settlement made of the judgment, recovered by appellant against the mining company, and the payment of $1,000 in consideration therefor, which money was furnished by respondent for that purpose, with the knowledge and acquiescence of appellant, constitutes a complete bar to this action.

The record discloses that on the day the appellant secured his judgment for. $3,500 against the mining company, the same was settled by an agreement of parties, by which the mining company paid him the sum of $1,000 in full satisfaction thereof. While the record fails to show respondent was a party to that contract of settlement, yet it does disclose the fact that respondent was present, knew of the settlement, and furnished the $1,000 with which the judgment was paid and satisfied. In fact the record shows that the mining company was at that time contending that it was still the duty of the respondent to defend the case, after the judgment was reversed by the Court of Appeals, which contention was denied by respondent, and in settlement of that controversy the respondent paid the $1,000 to the mining company, and in turn the latter company paid the same $1,000 to appellant in full satisfaction of his judgment of $3,500 rendered against it. In fact the mining company was insolvent and had no means with which to pay any claim.

From a careful reading of this record there is no room for serious doubt but what these various settlements of the various differences existing between the various parties constituted but one entire transaction and that the payment of the $1,000 by respondent to the mining company and by the latter to appellant, under the circumstances detailed, paid and discharged the judgment against the mining company, and all claims for damages the appellant had against the insurance company, for the unlawful part it took in the defense of the mining company case.

We are, therefore, of the opinion that the settlement mentioned constitutes a complete bar to respondent's right of recovery.

But in addition to that, the law is well settled in this State, that where an injured party accepts satisfaction for said injuries from one of two joint tortfeasors and releases that one from further liability,

then that fact will also release the other. And this rule is not confined to those who are strictly joint wrongdoers, but embraces all persons whom he might sue jointly or severally for the wrong complained of. [Chicago Herald Co. v. Bryan, 195 Mo. 575, l. c. 587; Hubbard v Railroad, 173 Mo. l. c. 255.] In our judgment this rule is broad enough to include the mining company and respondent, as they were co-operating with each other from the time the policy was issued until the $1,000 was paid and accepted by appellant.

At the risk of being criticised for the seeming repetition of some of the arguments made and for the length of the opinion, yet I feel justified therein, for the reason I wish to present the legal propositions involved in this case from as many standpoints as possible for the purpose of showing the fallacy of the arguments advanced and the reasons relied upon by the courts which have taken the opposite view of this class of insurance.

We are, therefore, of the opinion that the judgment should be affirmed, and it is so ordered.

All concur in result with the exception of *Valliant, C. J.,* to which and to paragraph four he dissents in a separate opinion; *Lamm, J.,* in a separate opinion, concurs as to paragraph four and as to result reached, but dissents as to paragraph one, and expresses his views as to paragraphs two and three in his separate opinion, with whom *Burgess, Fox, Gantt* and *Graves, JJ.,* concur.

### DISSENTING OPINION.

VALLIANT, C. J.—I concur in all that my learned Brother WOODSON has said concerning the character of the indemnity contract in question. In my opinion it is illegal because it is contrary to public policy and because humanity cries out against it. You cannot liken this to a contract of reinsurance against

a fire loss, because you cannot measure the master's duty to take care for the life of his servant by the same rule of conduct that you measure his right to take care of his property; you cannot measure life against money value.

As to the alleged settlement, I have only this to say. As long as there is a question as to liability, or as to the amount, the condition itself affords a consideration for an agreement of compromise or accord and satisfaction, but when both the liability and the amount are settled beyond controversy by a final judgment, there is no room for compromise or for accord and satisfaction; in such case the payment of a less sum than the judgment is a part payment only even though a receipt in full be given.

## SEPARATE MAJORITY OPINION.

LAMM, J.—This case was assigned to Division One and there briefed, argued and submitted. Written by our Brother WOODSON, it came into Banc on the dissent of VALLIANT, J.—a dissent to paragraph four, hence to the result. GRAVES and LAMM, JJ., concurred in paragraph four, hence in the result, but dissented (on some points wholly and on others partially) to all other paragraphs. In Banc, the case being rebriefed and reargued, a majority of the brethren concur in paragraph four (relating to settlement and discharge of liability) and in the result only. This necessarily includes concurrence in the result, *nisi,* and affirms the judgment.

Because of such concurrence in the result and in the paragraph relating to settlement, it has been deemed proper that the opinion of our Brother WOODSON should appear as the principal opinion in the case, and that the judgment of the majority of the court, modifying and disallowing the conclusions of fact and

law reached by him in other paragraphs, should appear separately and be appended.

To that end we rule as follows:

I. That maintenance is a doctrine of the law in this State is a proposition questioned by neither party to this suit and presents no new or open question. We have no bone to pick with it, we take no issue with the views of our brother on the abstract doctrine of maintenance, put with animation and eloquence, nor say we aught against the cases marshaled and arrayed in support of the general doctrine of maintenance. But, observe, that doctrine, as announced anciently, goes now with a grain of salt; for it must be understood that the rigors of the rules of the very old common law in that regard have been tempered and mellowed in modern times. The modern doctrine takes out of the rule against maintenance those who interfere in litigation in which they have, or honestly believe they have, an interest. Says Chief Baron, Lord ABINGER, in Findon v. Parker, 11 Mees. and W. l. c. 678: "Surely the old cases are now exploded. The sole question is, have the parties an interest, or do they believe they have an interest, in the action?" And GURNEY, Baron, in agreeing that maintenance was not in the Findon case, put his concurrence on the proposition that in the agreement the parties "have reasonable ground of belief that they have all one common interest."

Judge Story (Story's Eq. Jur. [13 Ed.], sec. 1048a) puts the matter this way: "But the doctrine of the common law as to champerty and maintenance is to be understood with proper limitations and qualifications, and cannot be applied to a person having an interest or believing that he has an interest in the subject in dispute and *bona fide* acting in the suit; for he may lawfully assist in the defense or maintenance of that suit."

SOMERVILLE, J., in Gilman v. Jones, 87 Ala. 691, going deeply into the manifest reasons for tempering the harsh rules of the very old common law, sums up by saying: "It is not surprising, therefore, that the law on this subject has gradually undergone a great change, which is recognized universally by jurists, judges and law-writers everywhere. This change has been called for by the new conditions of modern society, considered in its varied relations, commercial, political, and sociological. . . . There is much reason, it thus seems, for the relaxation of the old doctrines pertaining to the subject, so that they may be adapted to the new order of things in the present highly progressive and commercial age. Necessity and justice have, accordingly, forced the establishment of recognized exceptions to the doctrine of these offenses. Among these may be enumerated the following instances: Relationship by blood or marriage will often now justify parties in giving each other assistance in law suits; and the relation of attorney and client; or the extension of charitable aid to the poor and oppressed litigant; and especially is an interference in a law suit excusable, when it is by one who has, or honestly believes he has, a valuable interest in its prosecution."

When apprehended (through circumspect reading) there will be found nothing contrary to the foregoing principles in the opinion of The Right Honorable John Duke, Lord COLERIDGE, Lord Chief Justice of England, in the justly celebrated case of Bradlaugh v. Newdegate, L. R. 11 Q. B. Div. 1. That case was decided in our own day. It attracted more than passing attention at the time (1883) among English speaking people in America. Not merely because Lord Coleridge had been, shortly before, the guest of this nation and charmed us all with his wit, geniality and solid parts, not merely because the opinion was an uncommonly comprehensive, erudite and racy *resume*

of the law of maintenance, but, chiefly, because of the religious features in the case—Bradlaugh being an atheist and insisting on sitting in Parliament without taking the prescribed parliamentary oath. [See, also, authorities collated by counsel for respondent and cited in their briefs.]

The widening drift of the best modern thought and public policy, as bodied forth in modern legislation, in regard to some phases of maintenance, may be seen in such statutes as the Attorney's Lien Act, Laws 1901, p. 46.

Speaking generally, then, it is safely within correct bounds to say that any interest asserted in good faith, whether contingent, vested, near or remote, in pending litigation, relieves a party from a charge of intermeddling officiously (i. e., "maintenance") in a law suit, and makes the doctrine inapplicable. Otherwise a landlord, not a party, could not interfere to protect the possession of his tenant menaced by a suit, neither could a guarantor, warrantor or indorser, though contingently liable, assist in litigation.

In the case at bar it could not well be gravely contended that, if the indemnity policy were valid, it did not result in giving the defendant such an interest in the suit between Breeden and the Milling Company as would justify its aid in the defense. This is so because its own ultimate liability hinged on the outcome in that suit. But, contra, if its indemnity policy be in contravention of good morals or sound public policy or violative of principles of law, settled and universally recognized—what then? On that view of the matter, the policy would be void. If void, defendant was not liable to pay the indemnity in any event. If not liable to pay, it had no interest in the suit, ergo, its interference is clothed with no protection by the law. Barring good faith, it stands naked-

ly as an officious intermeddler and liable to an action.

Is the policy void? That is the main question. To its answer we pass.

II. The question is far from new. As presently seen, policies of the character criticised by our brother have been held valid by this court and (it is believed) by every appellate court holding their validity in judgment, and there are many of them. And the principles underlying these policies have been uniformly held sound. The form of insurance involved is not new or experimental, but has been recognized as legitimate and wholesome in all courts and in every civilized country. The validity of such policies, when denied, and the soundness of the principles sustaining them, were not adjudged as of course, but on full argument by great lawyers in great courts. Surely we should not slavishly follow precedents, revolting to right reason, however long the line of them or whatever glamor be about the names of those deciding them. Surely it is good doctrine that a court of justice should fearlessly hew to the line of the law, though in doing so such hewing distresses and unsettles the business affairs of the people. But should such business affairs be distressed and unsettled unless reason revolts at maintaining the *status quo?* And speaking of a court's hewing to a line, without fear and without favor, are not those brave words audacious, and would not one be a bold and bad axman in hewing to the line, *unless prime care be taken to first chalk down the right line to hew to?* So, is it altogether philosophical to disregard precedents? Is the venerable doctrine of *stare decisis* to be quite whistled down the wind in the case? Is not *certainty* of the very essence of good law? If many wise and good judges at different times in widely separated jurisdictions, each of them with open minds seeking for truth

and justice on independent lines, each looking at the subject-matter from all sides, all finally with one accord agree on a given proposition, does that proposition not partake of the nature of a maxim, that is, a proposition no longer to be questioned and about which reagitation, discourse and argumentation come to an end? Is there not a strong presumption, to be indulged by a seeker after truth, that a conclusion is right which has been arrived at by the trained minds of many just men in possession of all the facts and in full light of all possible reasoning (pro as well as con), and unreservedly acquiesced in after re-examination? The right answers to these questions seem apparent; and those questions lead up to others, viz.: Is the doctrine of our brother's opinion sustained by any decided case (controlling or persuasive)? And may not our dissent rest, somewhat, in the first instance, on the fact that if it be allowed as sound doctrine it overturns our own and runs counter to all the case-learning on the subject?

The validity of insurance, like this, taken to indemnify a carrier or employer of men against the lapses, slips, inadvertances, misadventures and negligences incident to their business, has been ruled by this court in Railroad v. Southern Railway News Co., 151 Mo. 373; again, the principle was ruled in Railroad v. Ordelheide, 172 Mo. 436. In those cases the validity of such agreements was assailed as against public policy, precisely as here. The doctrine, on the strength of which Railroad v. Southern News Company was ruled, is announced by the Supreme Court of the United States in Phoenix Ins. Co. v. Erie & Western Trans. Co., 117 U. S. 312—Mr. Justice Bradley alone dissenting. The reasoning employed and conclusions reached in that case were re-examined by the Supreme Court of the United States in California Ins. Co. v. Union Compress Co., 133 U. S. 387, and sustained unanimously. The same principle was

announced subsequently in Hartford Fire Ins. Co. v.
Railroad, 175 U. S. 91, and was involved in Wager
v. Providence Ins. Co., 150 U. S. 99. The matter was
ruled the same way in the American Casualty Com-
pany's Case, 82 Md. l. c. 574, *et seq.;* the same way
in Trenton Passenger R. R. Co. v. Guarantors' Lia-
bility Indemnity Co., 60 N. J. L. 246; the same way in
Railroad v. Mercantile Tr. & Dep. Co., 34 Atl. l. c.
785, *et seq.* (another Maryland case) ; and (inferential-
ly) in Finley v. U. S. Casualty Co., 113 Tenn. 592;
in Sanders v. Frankfort Marine, Accident and Plate
Glass Ins. Co., 72 N. H. 485, and in Connolly v. Bolster,
187 Mass. 266.

Excerpts from some of these cases appear in the
opinion of our brother, and we will not swell this op-
inion by repetition. In a nutshell, the established doc-
trine may be thus summed up: (1) Such insurance
does not lessen the employer's liability or responsi-
bility, but increases his means of meeting both; (2) all
insurance at bottom is mere indemnity and (having
regard to negligence) the principles of law sustaining
any other form of insurance, sustain the character of
insurance involved here; (3) indemnity insurance, re-
lieving against negligence, is but insurance against
"usual perils;" (4) the settled principle that an em-
ployer of men or common carrier cannot contract with
employees, passengers or shippers against his own
negligence is in no way impinged upon by the indem-
nity contract of an insurer providing insurance against
one's own negligence or that of a vice-principal or
one's servants; (5) that despite such indemnity con-
tract, the liability of the master to the servant, and
the carrier to the passenger or shipper, for negligence,
is neither indirectly or by implication impugned, im-
paired, abridged or whittled away, but remains in
full flower and vigor precisely as it was before the
insurance; (6) that the existence of an indemnity
fund does not directly or necessarily cause the master

or carrier to relax his care and diligence to prevent injury to servants, passengers or shippers; (7) that, at best, the indemnity is only limited and partial; (8) that the indemnity contract does not call for any relaxation of the vigilance of the employer or carrier, but (*contra*) contemplates constant vigilance by each of them; (9) that the employee, shipper, or passenger, instead of less security, has the *added security* of the vigilance, experience and self-interest of the insurance company itself to prevent the use of negligent methods, negligently constructed or operated machines and appliances or other negligent exposure to injury; (10) that the diffusion of losses arising from indemnity insurance against negligence in transportation, mining and manufacturing, etc., promotes business, tends to make it stable and thereby increases the demand for labor and tends to improve wages; (11) that there is no unvarying rule, of which judicial notice will be taken, that an indemnity against losses by negligence will, in and of itself, induce a master or carrier to omit the highest degree of care, and that (absent such rule) it does not logically follow that an indemnity contract is directly or incidentally repugnant to public policy; and finally, (12) that the clause in the policy of insurance permitting the insurer to have charge of a case in court and forbidding a settlement at the initiative of the insured, relates only to the liability of the insurance company to the insured, and in no way forbids a settlement with the injured party, if the insured desires to take such course independently of his contract.

Obviously, we could stop at this point by ruling the policy in question a valid contract, and that the interference of defendant in the litigation between Breeden and the Milling Company was not maintenance as that term is used in the law. But there is another view of the case taken by our brother, deserving comment and determination.

III.  As we grasp the evolution of his argument, it concedes the validity of ordinary fire, marine and life insurance. . It proceeds on the notion that fire and marine insurance involve only property, the property of the insured held by him as owner or in trust. On this notion, such insurance is sought to be distinguished from indemnity for losses arising from negligence to *third parties,* because the lives and limbs of such third persons are involved and the welfare of society is thereby put at stake.  Hence, so the argument runs, the temptation and invitation ·to negligence (because of the indemnity) stand on a different foot.  Hence, also, while other forms of insurance are valid, the form in question is invalid as against public policy.  But we agree with every court considering the matter that such distinction is without substance, and we are of opinion that if the doctrine announced is to be allowed and applied as a principle of law, it will sap and overthrow the foundations on which all insurance is built, whether life, fire, accident, health or marine.. This because, if we follow the subject-matter of insurance to its very tap-root, it will be found that negligence in some form is bound up with or collaterally related to every form of it and that the interests of "third persons" is involved in it all.  Therefore, if indemnity may not go in one form of insurance, for that it encourages negligence, it ought not to go in another, under the trite maxim that like reason makes like law.

To illustrate:  Take a contract of bottomry.  The master's ship and cargo are insured by the payment of a large interest on a loan which the ship and cargo are hypothecated to secure.  If the ship be cast away, or the event happens on which the risk hinges, the loan is not to be repaid and the master stands to lose little or *nil.* .As the argument runs, as I see it, a master (so secured) through self-interest will be inclined to put an unworthy vessel to sea, or negligently

sail her. He cares not (so runs the argument) whether she sinks or swims. When she goes down, what become of the sailors and passengers? Their flesh goes to the fishes and their bones whiten the bottom of the sea. Is bottomry, therefore, a *void* contract?

Take a fire insurance policy—say, on a theatre. The owner, being indemnified, is secure. Therefore (so runs the argument) he will neglect precaution against fire. Observe, such precaution costs money, it pays him to skimp and save. Now, when a fire occurs and many human beings are consumed as in a firey furnace, heated seven times hot, are not *third parties* involved? Did not the owner's negligence lead up to the injury or death of many people? And, on the theory advanced, is not the contract of fire insurance *void?* The same result may be reached by that line of argument in accident, health and life insurance.

The basic theory of our brother's opinion seems grounded on a notion quite foreign to the law, to-wit, that self-interest, set on foot by the indemnity, will inevitably goad or seduce the master into a fixed attitude of cruelty, oppression or neglect to the servant. The law does not tolerate that doctrine or view the employer of men with such cold and suspicious eye; and in these times of unrest when there is a set attempt (long persisted in elsewhere) to split mankind, whether or no, into warring classes, natural enemies all, based on the bitter and perverted notion that men are bound to be enemies wherever and whenever one *employs* and the other *serves,* this court, as I read its judgments, has set its face like flint against that pestiferous heresy as unknown to the law of the land, ruinous to the social compact in a nation of free people, unsound in philosophy and false in fact. We but play with fire when we directly or indirectly countenance it. We cannot agree that A loses or weakens his humane instincts towards B when he hires B to labor, or when

he takes out a policy of insurance partially indemnifying himself against loss by reason of imperfect machinery, inadvertent lapses, lack of due care, forgetfulness, or other form of unintentional wrong. Labor is honorable. It accords with divine law. It accords with natural law. There is mischief in idleness. Respect for the life, limb and happiness of the laborer is implanted in man and reigns among the natural equities of the human breast. That there may be now and then those who violate these equities does not militate against the rule itself.

A predisposition to fraud, neglect or any form of wrong is never *presumed* by the law. It must be established by proof. In dispensing justice through the courts, where one of two open theories must be taken, and the other left, the one ignoble and the other noble, the law takes the nobler one of the two where the facts warrant either. To say that partial indemnity is bound to produce neglect, and that because the master cannot contract against his own neglect, therefore he cannot contract for indemnity, is unsound argument because the premise is fanciful and unsound.

IV. Speaking of public policy, the student of history speedily learns that to-day it is one thing and to-morrow another. Speaking of it judicially, it has the same weather-vane peculiarity, as the prying mind will discover. As pointed out in the cases cited from Maryland and New Jersey (The American Casualty Co. Case, 82 Md., *supra;* the Trenton Passenger Railroad Co. Case, 60 N. J. L., *supra,* and in the Boston, Etc., Co. Case, 34 Atl., *supra*), public policy in relation to trades, manufacturing, the duty and liability of carriers and employers, has constantly varied to keep pace with the growth and development of such occupations and businesses. I myself, in the fervor

of interpretation, once (by way of metaphor) characterized public policy as the "hand-maiden of sound judicial exposition." [Hale v. Stimson, 198 Mo. l. c. 165.] And a very shrewd old English judge (BURROUGH, J., in Richardson v. Mellish, 2 Bing. Com. Pl. l. c. 252), long since characterized it as an "unruly horse" likely to lead one from the sound law and "never argued at all but when other points fail." My Brother GANTT brought these two metaphors on the carpet in State ex rel. v. Dirckx, 211 Mo. l. c. 579, seated them there, vis a vis, and left them to confront each other for all time.

As showing how public policy veers from day to day in the development of the law relating to trades, etc., a quaint incident, illustrating the point, was dug up from the dust of the past by MAGIE, C. J., in the Trenton Passenger Railroad Co. Case, 60 N. J. L., supra, told on no less authority than that of Lord St. Leonards. Speaking of a case from the Year-Books, Lord St. Leonards says: "It was on an obligation with a condition that if a man did not exercise his craft of a dyer within a certain town—that is, where he carried on his business—for six months, then the obligation was to be void, and it was averred that he had used his art there within the time limited; upon which Mr. Justice HULL, being uncommonly angry at such a violation of all law, said, according to the book: 'Per Dieu, if he were here, to prison he should go until he made fine to the king, because he had dared to restrain the liberty of a subject.' Angry as the learned judge was at that infraction of the law, what has been the result of that very rule without any statute intervening? That the common law, as it is called, has adapted itself upon grounds of public policy to a totally different and limited rule that would guide us at this day, and the condition which was then so strongly denounced is just as good a condition now as any that was ever inserted in a contract, be-

cause a partial restraint created in that way with a particular object is now perfectly legal.''

If Uncle Toby's oath was blotted out by the recording angel (which stands asserted by one author), peradventure the same kindly Spirit blotted out that of Mr. Justice HULL. Be that as it may, in the cases referred to, the changes in public policy on phases of the law relating to the occupations and business in hand is shown to clearly justify the conclusion that indemnity insurance is not invalidated by reason of modern public policy.

The premises all considered, the reasoning of our brother on points really in judgment in all paragraphs, except paragraph four (relating to accord and satisfaction) is disapproved. His conclusions of fact are disallowed. The policy in question is held valid, and, as held by him in paragraph four, there is present an additional reason why the judgment below was right, to-wit, that all claims against defendant, unsound as they were, were discharged by the settlement. We so hold.

Let the judgment be affirmed. *Gantt, Burgess, Fox* and *Graves, JJ.,* concur with me in these views.